In re Franklin E. SEIDEL and Carol C. Seidel, husband and wife, Debtors.

Franklin E. SEIDEL and Carol C. Seidel, Plaintiffs,

v.

The FIRST NATIONAL BANK OF PALMERTON, Defendant,

v.

JONES TRUCK SALES, Third Party Defendant.

Bankruptcy No. 81–01086 T.
Adv. Nos. 82–0499, 82–0536.

United States Bankruptcy Court,
E.D. Pennsylvania.

Feb. 1, 1983.

---

David Eisenberg, Allentown, Pa., for plaintiffs.

Patrick J. Mellody, Scranton, Pa., for defendant.

John M. Ashcraft, III, Allentown, Pa., for third party defendant.

## OPINION

THOMAS M. TWARDOWSKI, Bankruptcy Judge.

In this Chapter 7 case, the debtors are seeking to avoid the transfer of debtor Franklin E. Seidel's alleged equity in a 1973 Mack truck in order to recover and exempt the alleged equity pursuant to Section 522(h) of the Bankruptcy Code, 11 U.S.C. § 522(h). The defendant is the First National Bank of Palmerton (hereinafter "Bank"), which had loaned $8,500.00 to Mr. Seidel in connection with his purchase of

the truck, had taken a security interest in the truck, and to which Mr. Seidel subsequently returned the truck. The third party defendant is Jones Truck Sales, which sold the truck in question to Mr. Seidel for $12,500.00 and which was a guarantor of Mr. Seidel's obligation to the Bank. The debtors claim that Mr. Seidel returned a truck worth $12,500.00 to the Bank whereas Mr. Seidel owed only $8,500.00 to the Bank, thereby giving rise to a $4,000.00 avoidable preferential transfer to the Bank which the debtors seek to recover from the Bank and, in turn, exempt pursuant to 11 U.S.C. § 522(h). For the reasons hereinafter given, we conclude that the debtors are entitled to recover from the Bank and, in turn, exempt any equity which Mr. Seidel had in the truck at the time of its return to the Bank. However, a supplemental hearing will be necessary to determine how much, if any, equity existed at that time.[1]

## I. FACTS

In early February, 1981, Mr. Seidel purchased the aforementioned 1973 Mack truck from Jones Truck Sales for $12,500.00. The purchase price was composed of $4,000.00 in cash from Mr. Seidel[2] and a check for $8,500.00 from the Bank payable to Theresa Jones, a principal of Jones Truck Sales, on behalf of Mr. Seidel. As part of the loan agreement between the Bank and Mr. Seidel, the Bank received a security interest in the truck and a first encumbrance on its title. Also, the Bank required Mrs. Jones to deposit with the Bank an $8,500.00 certificate of deposit as additional security for the Bank's loan.

On March 1, 1981, Mr. Seidel called his loan officer at the Bank and asked him to send somebody to his home to pick up the truck because he had been unsuccessful in his attempt at the trucking business and wished to return the truck.[3] Mr. Seidel's return of the truck was prompted by his family's desperate financial situation at that time. Before returning the truck, he had called the insurer of the truck and been informed that he could obtain a refund of certain prepaid insurance premiums if he returned the truck. Mr. Seidel did receive the much-needed refund from the insurer following his return of the truck.

After receiving Mr. Seidel's telephone call, the Bank's loan officer contacted Jones Truck Sales and requested that its employees pick up the truck and take it to Jones Truck Sales, which they did on March 1, 1981. Employees of Jones Truck Sales performed repairs, apparently of a mechanical nature, on the truck for approximately four or five days after its return.

Soon after the return of the truck, the Bank, Jones Truck Sales, and Thomas Morgan (see footnote 2, *supra*) agreed that Mr. Morgan (principally) and Jones Truck Sales would pay off the Bank's loan. In return, the Bank would release its interests in the truck, including its encumbrance on the title, and would release the $8,500.00 certificate of deposit of Mrs. Jones. Furthermore, Mr. Morgan would be permitted to "sell" the repaired truck, with the assistance of Jones Truck Sales, even though the title was still in the name of Mr. Seidel and never was in the name of Mr. Morgan, the Bank, or Jones Truck Sales following Mr. Seidel's purchase of the truck.

By approximately late March, 1981, this agreement had been carried out, with Mr. Morgan paying $8,648.32 to the Bank and Jones Truck Sales paying $138.91 to the Bank, the total comprising the principal, interest, and finance charges at that time owed by Mr. Seidel to the Bank. In addition, Mr. Morgan, with the assistance of Jones Truck Sales, had "sold" the truck to an Emilio Rodriguez for $12,500.00. Mr.

---

1. This opinion constitutes the findings of fact and conclusions of law as required by Rule 752 of the Rules of Bankruptcy Procedure.

2. The debtors acquired this $4,000.00 as part of a $5,000.00 loan from a Thomas Morgan. In return for the loan, Mr. Morgan received a second mortgage on the debtors' home. However, Mr. Morgan did not acquire an encumbrance against the truck.

3. Mr. Seidel never paid any money to the Bank. The first monthly payment on the truck was not due until March 25, 1981.

Morgan received $2,500.00 in cash from Mr. Rodriguez and a $10,000.00 judgment note signed by Mr. Rodriguez, along with having a first encumbrance on Mr. Rodriguez's title to the truck.[4] Mr. Rodriguez never paid nor owed any money on the truck to anyone other than Mr. Morgan.

## II. PROCEDURAL HISTORY

The debtors filed their Chapter 7 bankruptcy petition on March 27, 1981, claiming the alleged $4,000.00 equity in the truck as an exemption pursuant to 11 U.S.C. § 522(d)(5).

Subsequently, the debtors filed their § 522(h) complaint against the Bank, the theory of which we have discussed *supra.* The Bank, in turn, filed a third party complaint against Jones Truck Sales, claiming that any alleged equity which the debtors may recover in this action should be recovered against Jones Truck Sales and not the Bank.

At the trial of this matter, testimony was given by debtor Carol C. Seidel, Mr. Morgan, the Bank's loan officer, and Mrs. Jones of Jones Truck Sales. Mr. Seidel was unavailable to testify.

## III. STATUTORY FRAMEWORK

Section 522(h) of the Bankruptcy Code, 11 U.S.C. § 522(h), states:

(h) The debtor may avoid a transfer of property of the debtor or recover a setoff to the extent that the debtor could have exempted such property under subsection (g)(1) of this section if the trustee had avoided such transfer, if—

(1) such transfer is avoidable by the trustee under section 544, 545, 547, 548, 549, or 724(a) of this title or recoverable by the trustee under section 553 of this title: and

(2) the trustee does not attempt to avoid such transfer.

Section 522(g) of the Bankruptcy Code, 11 U.S.C. § 522(g), states:

(g) Notwithstanding sections 550 and 551 of this title, the debtor may exempt under subsection (b) of this section property that the trustee recovers under section 510(c)(2), 542, 543, 550, 551, or 553 of this title, to the extent that the debtor could have exempted such property under subsection (b) of this section if such property had not been transferred, if—

(1)(A) such transfer was not a voluntary transfer of such property by the debtor; and

(B) the debtor did not conceal such property; or

(2) the debtor could have avoided such transfer under subsection (f)(2) of this section.

■ The effect of these two provisions is that if the trustee does not pursue an avoiding power to recover a transfer of property that would be exempt, the debtors may pursue it and exempt the property, if the transfer was involuntary and the debtors did not conceal the property. In the present case, the trustee did not attempt to avoid the transfer. The avoiding power invoked by the debtors is Section 547(b) of the Bankruptcy Code, 11 U.S.C. § 547(b), which permits the avoidance of preferential transfers of property of a debtor. Section 547(b) states:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

---

**4.** It is not clear from the record how the title came to be transferred from the name of Mr.

Seidel to that of Mr. Rodriguez.

(B) between 90 days and one year before the date of the filing of the petition, if such creditor, at the time of such transfer—

(i) was an insider; and

(ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

## IV.  DISCUSSION

■ We conclude that, if Mr. Seidel had any equity in the truck at the time of its return to the Bank, such return constituted a preferential transfer of Mr. Seidel's property to the Bank within the meaning of § 547(b).  Assuming equity, all five elements of § 547(b) are satisfied, with the Bank as the creditor.  In this regard, the Bank contends that it received full payment for its loan and nothing more.  It is true that the Bank's loan was fully satisfied and that it received no additional money from anyone else.  However, again assuming equity, the crucial point is that the Bank did receive from Mr. Seidel property which was worth more than the debt owed to the Bank by Mr. Seidel.  This in itself is sufficient to meet the requirements of § 547(b)(5).  The Bank's somewhat unusual disposition of the truck following its return to the Bank does not alter this basic fact and should not be permitted to prejudice the debtors.

■ The Bank contends in its third party complaint that any alleged equity which the debtors may recover in this action should be recovered against Jones Truck Sales and not the Bank.  We find this contention to be without merit and note that the Bank has hardly attempted to justify this conten-

tion.[5]  Suffice it to say that Mr. Seidel dealt exclusively with the Bank in returning the truck and properly did so in that it was the Bank to which he owed the debt and which had the security interest in the truck.  The fact that the Bank asked Jones Truck Sales to pick up the truck for the Bank does not, of course, make any difference in this regard and does not change the fact that Mr. Seidel returned the truck to the Bank and not to Jones Truck Sales.  Therefore, the Bank's third party complaint against Jones Truck Sales shall be dismissed.

Having determined that, assuming equity, a preferential transfer to the Bank has occurred, and that the Bank's third party complaint is without merit, we now turn to the remaining and most difficult issue in this case: Was the transfer a voluntary or involuntary transfer within the meaning of § 522(g)(1)(A)?  The debtors cannot succeed on their complaint unless they can show that the return of the truck to the Bank was not a voluntary transfer.

Neither the Bankruptcy Code nor the legislative history accompanying § 522(g) sheds any light on the meaning of "voluntary transfer".  The only case which the parties and the Court have found which analyzes this term with respect to the knowledge and state of mind of a debtor is *In re Reaves,* 8 B.R. 177, 181 (Bkrtcy.D.S.D. 1981), wherein the Court stated:

"For purposes of this decision, this Bankruptcy Court holds that an 11 U.S.C. Section 522(g)(1)(A) voluntary transfer occurs when a debtor, with knowledge of all essential facts and free from the persuasive influence of another, chooses of her own free will to transfer property to the creditor.  A voluntary transfer does not occur where a creditor has harassed, insulted, and shamed a debtor into transferring the property to the creditor.  Nor has a voluntary transfer occurred where a creditor has concealed or failed to inform a debtor of essential facts necessary for the debtor to make an intelligent decision on whether to transfer the property to the creditor.  This is especially

---

**5.**  No brief was filed on behalf of the Bank in   this case.

true where a debtor can show that she would not have made the transfer had she been informed of all the essential facts."

 In determining the voluntariness of a transfer, the *Reaves* Court appears, at times, to place greater emphasis upon the freedom from persuasive influence than upon the knowledge of all essential facts. However, we believe that we are consistent with *Reaves* and with the spirit of the Bankruptcy Code in holding that a voluntary transfer of property does not occur where a debtor does not have knowledge of all of the essential facts pertaining to the transfer, the creditor to whom the transfer is made fails to inform the debtor of any essential facts within the creditor's knowledge, and the debtor would not have made the transfer had he been aware of all of the essential facts.

In the present case, we conclude that Mr. Seidel's transfer to the Bank of his alleged equity in the truck was not voluntary. Mrs. Seidel credibly testified that neither she nor Mr. Seidel was aware that the return of the truck to the Bank might result in Mr. Seidel's loss of his alleged equity in the truck. This was clearly an essential fact pertaining to the transfer. Also, the testimony of Mrs. Seidel and the Bank's loan officer indisputably shows that the Bank did not inform either Mr. or Mrs. Seidel of this fact, which was within the Bank's knowledge. Furthermore, Mrs. Seidel credibly testified that Mr. Seidel would not have returned the truck to the Bank had he known that he stood to lose his equity in the truck by doing so.

We have considered the fact that Mr. Seidel contacted the Bank regarding the return of the truck and not vice versa. Also, we are aware that the Bank did not pressure the debtors in any manner. Nevertheless, these two considerations do not alter our conclusion that the transfer in question was not voluntary.

A supplemental hearing will be necessary to determine how much, if any, equity Mr. Seidel had in the truck at the time of its return to the Bank. The debtors will be entitled to recover this amount from the Bank and, in turn, exempt it. In determining equity, at the supplemental hearing, we shall be receptive to competent evidence regarding, among other things, the costs and expenses incurred by either the Bank or Jones Truck Sales in relation to the truck from the picking up of the truck from Mr. Seidel on March 1, 1981 to its "re-sale" to Mr. Rodriguez.