**In re Benjamin and Naomi DAVIS, Debtors.**

**Benjamin and Naomi DAVIS, Plaintiffs,**

v.

**Phyllis SUDEROV, Defendant.**

**Bankruptcy No. 092–72048–21.**
**Adv. No. 092–7152–21.**

United States Bankruptcy Court,
E.D. New York.

Nov. 18, 1992.

Bennett & O'Shea by James O'Shea, Southampton, NY, for debtors/plaintiffs.

Heller & Rosenberg by Craig Heller, Huntington, NY, for defendant.

## OPINION

CECELIA H. GOETZ, Bankruptcy Judge:

Benjamin and Naomi Davis, the Debtors in this voluntary Chapter 13 proceeding, are suing to avoid, as a fraudulent conveyance a sale to the defendant of their marital residence followed by a leaseback of the house to their daughter. Phyllis Suderov, the defendant, acted as her husband's accessory in tricking the Davises into entering into an unconscionable transaction.

## FINDINGS OF FACT

In 1977 the Davises, with funds borrowed from the Farmers Home Administration ("FHA") were able to buy a new house in Bridgehampton, New York. The house is a three bedroom, one bath house, situated on a half acre. Its original cost, approximately $30,000, was financed almost entirely by a FHA note and mortgage in the principal amount of $27,000. Over the years the house has appreciated in value. Three appraisals went into evidence. The lowest values the house at $55,000, the highest at $85,000. Land in its general area is now worth $25,000 an acre.

Living in the house at the present time are Mrs. Davis, her two grown daughters, four grandchildren and a greatgrandson, eight people in all. Until the Davises bought the house here involved, they had never bought a home. Apart from the FHA mortgage they had never borrowed money. Mr. Davis has a tenth grade education, obtained in North Carolina, and works as an orderly at a local hospital.

In 1982 Mr. Davis moved out of the marital residence and sometime later began divorce proceedings which are still pending. After the divorce action began, he stopped making payments toward the FHA mortgage which fell into arrears. For some years now Mrs. Davis' sole income has been the disability allowance she receives from Social Security. One daughter and her four children also live on an allowance made them by Social Security. The only member of the family living in the house and currently employed is Tammy Davis.

By 1991 arrears on the mortgage, on which the payments were $195 per month, had grown to approximately $10,000 and FHA commenced a foreclosure proceeding.

Depending upon what appraisal is used, the Davises by that time had an equity in their house of somewhere between $19,260 and $49,260. The FHA mortgage had been reduced to $24,680 apart from arrears. Although there was a second mortgage of approximately $14,000 on the house recorded in connection with some improvements made by Mrs. Davis it was invalid because Mr. Davis' signature was forged. Mrs.

Davis looked to the equity in her house to solve her financial problems. She sought a second mortgage to pay off the arrears to the FHA and save her house from foreclosure.

She told an acquaintance, "Fran," that she was looking for a second mortgage. Fran, in turn, told Jules Golub of Final Touch Funding, which is in the business of arranging loans "for people who are hard-pressed," that Mrs. Davis was in the market for money. He called Mrs. Davis and arranged to have Richard Suderov telephone her that evening. Mr. Suderov told her that he thought he could help her. He said he could save her house by a second mortgage or by a sale. Mrs. Davis told him flatly that she did not want to sell her house, that what she wanted was a second mortgage.

Before Mr. Suderov would do anything, he told Mrs. Davis that she would have to pay him $2,000 for an appraisal. Out of the $2,000 he received from her he turned $500 over to Final Touch Funding.

Arrangements were made for a closing to take place on April 9, 1992 at the offices of Daniel Naeder, Esq., the attorney for Mrs. Suderov. Before the closing, Mrs. Davis asked her attorney, Mr. James O'Shea, to review the papers sent her by Mr. Suderov. After Mr. O'Shea reviewed them, he asked her if she wanted to sell her house. When she said flatly that she did not, Mr. O'Shea told her that he would not represent her because what she was doing was selling her house. He told her that a better solution would be filing under Chapter 13. Mrs. Davis reported what Mr. O'Shea had said to Mr. Suderov and he scoffed at it. He said flatly he did not want her house, that he was not interested in the house. He said that if bankruptcy was any solution he would himself have recommended it. He led her to believe that transferring title to the house was just a formality necessary to satisfy the FHA; that she would get back her house after the closing. Since Mr. O'Shea was unwilling to represent her he said he would get her another lawyer.

At the closing scheduled on April 9, 1992, at the office of Mr. Naeder, Richard Wiener introduced himself to the Davises as their attorney. Mr. Davis had agreed to be present in order to help his wife. He is a simple man who was willing to go along with whatever his wife wanted for herself and their children and who trusted implicitly in his wife's understanding of what was taking place.

Sometime after the closing began, Mr. Wiener walked out because the necessary documents had not yet been prepared and he could not tell the nature of the transaction. Also, Mr. Suderov wanted another $2,000 from the Davises for the work he had done in securing a satisfaction of the second mortgage. Sometime before June 16, 1992 he was given the $2,000 he demanded. Mr. Davis insisted that it was unnecessary, because of the forged signature, to satisfy the second mortgage.

The closing was rescheduled for June 16, 1992. Present at this closing were Mr. and Mrs. Davis, their daughter, Tammy, Mr. and Mrs. Suderov, Mr. Wiener, Mr. Naeder, Fran, Golub and a representative of the title company. Mr. Wiener saw for the first time on April 9th the very complex set of documents prepared by Mr. Naeder. The documents consisted of a deed, and a twelve page agreement with forty five numbered paragraphs entitled "Agreement with Option to Purchase," ("Agreement") to which was annexed an "Agreement Receipt and Statement," a "Memorandum of Municipal Requirements," and an "Insurance and Option Memo Excerpt." The Agreement is in fact both a lease and an option.

In essence, what these documents embody is a sale by Mr. and Mrs. Davis of their house to Mrs. Suderov and a lease-back of the premises to Tammy Davis with payment of the rent guaranteed by Mr. and Mrs. Davis. Contained in the lease is an option to buy back the premises (but not the fixtures in the house or related personalty) on extremely onerous terms at a price four to five times what the Suderovs were paying. Execution of these documents gave rise to an immediate liability in Tammy Davis, guaranteed by her parents, to pay $12,719 to Mrs. Suderov. This is because the lease makes the first year's rent payable in its entirety upon execution of the Agreement.

These documents are not only complex, they are unintelligible. When Mrs. Suderov was asked at the trial to explain the paragraph calling for a recomputation of the option price each year she was totally unable to do so, offering as a lame explanation that the language represented Mr. Naeder's "legalese."

Mr. Suderov took charge of the closing, allaying the Davis' concerns over what was happening. He assured the Davises that he only wanted to help them, that he did not want their house, that they would get their house back after the closing, that if they wanted to save their house this was their only option and that the closing and the transfer of the title were necessary to satisfy the FHA, not because he wanted the house. These statements were not true. As events show, he misrepresented his intentions. He wanted the house. The transfer of title was not a mere formality. The Davises believed and trusted in him. They relied on his statement that he did not want their house. If they had not relied on his statements and misrepresentations, they would not have signed the deed.

Although Mr. Wiener claims that he explained the documents to the Davises so that they would understand to what they were committing themselves, it is clear that he did not understand the transaction himself, since it was only at the trial that he realized that the option to buy the property back was given only to Tammy Davis and not to his clients, Mr. and Mrs. Davis. Furthermore, it was doubtful that Mr. Wiener, based on a few hours' examination of the complex documents in a tumultuous atmosphere, could have even understood, let alone intelligently explained, provisions which are so garbled and unintelligible that this Court has been unable to resolve their meaning after reviewing them carefully.

Mrs. Davis says that she did not understand what was taking place, that she simply signed where she was told to sign. She

admits that she knew that she was transferring title but she relied on Mr. Suderov's representations that the transfer was only a formality necessary to satisfy the FHA and the house would continue to belong to her.

Despite Mr. Suderov's honeyed blandishments and despite the desperate situation in which Mrs. Davis thought herself to be, enough penetrated of the nature of the unconscionable transaction into which the Davises were entering to reduce Tammy Davis periodically to tears. Mr. Wiener, to his credit, protested some of the more onerous provisions and tried to have them changed, but it was made clear to him that it "was a take it or leave it situation" and that there was no flexibility in the deal.

Execution of the lease, which was part of the transaction, generated an *immediate* obligation to pay $12,719 to Mrs. Suderov, dischargeable through equal monthly payments, described as an accommodation to the lessee. The first year, the monthly payment is $1,106. Late charges are assessed in the amount of fifteen percent if the monthly payment is late seven days or more. A default entitles the lessor to accelerate payment of the entire amount, $12,719, due the first year. The named lessee is Tammy Davis with payment guaranteed by both her parents.

The document leasing the property to Tammy Davis included an option to buy, exercisable for five years. If Tammy Davis wished to exercise the option to purchase, it would cost her $56,500 if she exercised the option the first year. If she waited until the second year, the option price would rise to over $63,000. Thereafter it escalated one percent each month. The option price increased eight percent each year, in addition to the regular monthly increases.

The option does not include the washing machine, dryer, dishwasher, refrigerator, air conditioner and TV etc. sold by the Davises to Mrs. Suderov. These remain the property of Phyllis Suderov even if Tammy Davis elected to buy back the house.

The lease and option agreement are so full of penalties, escalation clauses, and monthly increases that it is impossible even for the most sophisticated lawyer to calculate exactly what the rent or the option price is or will be at any point in time. However, depending upon the reading of several of these ambiguous paragraphs, the option price ultimately escalates to over $109,000. At the same time the rent similarly jumps. At the end of the fifth year the monthly rent is just under $1,800 per month.

When the transaction was completed, the house in which the Davises were living was the property of Phyllis Suderov and the Davises owed her $12,719 for the first year's rent on their former home with a first payment of $1,106 per month due two weeks after the closing. No money was given the Davises. They received not a penny for the transfer of an equity in the Bridgehampton home of a value of between $19,000 to $49,000 to Mrs. Suderov.

Despite the fact that the Davises received not a penny from the Suderovs for the transfer of the title to their house, the following closing statement prepared by Mr. Naeder (of which no copy was given the Davises) showed the Suderovs as expending $25,817.10 to acquire the house as well as taking subject to the FHA mortgage of $24,680, making the total purchase price $50,497.10.

| AMOUNTS DUE SELLER | AMOUNTS |
|---|---|
| PURCHASE PRICE (20,000.00 OVER THE EXISTING MORTGAGE ON THE PREMISES AS REDUCED .. | 20,000.00 |
| ADJUSTMENTS: | |
| CREDIT FOR 02/12/92 PAYMENT RECEIVED FROM THE SELLERS .................................... | 500.00 |
| CREDIT FOR 02/12/92 PAYMENT RECEIVED FROM THE SELLERS .................................... | 1,500.00 |
| CREDIT FOR 02/12/92 PAYMENT RECEIVED FROM THE SELLERS .................................... | 2,000.00 |

| | | |
|---|---|---|
| TOTAL DUE SELLER ............................... | | <u>24,000.00</u> |
| PURCHASE PRICE PAID AS FOLLOWS: | | |
| (ASSUMPTION OF EXISTING MORTGAGE).......... | | |
| PROCEEDS CHECKS IN THE AMOUNT SET FORTH | | |
| IN THE ANNEXED SCHEDULE................... | 25,817.10 | |
| ......................................................... | 646.98 | |
| EXCESS AMOUNTS PAID BY PHYLLIS SUDEROV | | <u>(1,817.10)</u> |
| EXPENSES AND COSTS OF SELLER PAID BY PURCHASER'S CHECKS | | |
| TITLE CHARGES (CHECK NO. 222) | | |
| REVENUE STAMPS ............................... | 80.00 | |
| FEE TO RECORD SATISFACTION .................. | 36.50 | |
| STREET REPORT FEE ............................. | 14.00 | |
| SURVEY INSPECTION ............................. | 35.00 | |
| TITLE EXAMINATION CO. TITLE INSURANCE $462.00 LESS CREDIT FOR $350.00 ............... | 112.00 | |
| RECORD DEED ..................................... | 78.00 | |
| U.S. TREASURER (MORTGAGE) (CHECK NO. 2220).............. | | 10,863.73 |
| U.S. TREASURER (MORTGAGE) (CHECK NO. 2221).............. | | 195.00 |
| TITLE CLOSER (PICK–UP FEE) (CHECK NO. 2223).............. | | 100.00 |
| RICHARD WIENER (LEGAL FEE) (CHECK NO. 2224) ............ | | 550.00 |
| DANIEL NAEDER (LEGAL FEE) (CHECK NO. 2225).............. | | 1,500.00 |
| CREDIT REPORTS (ON SELLERS AND TENANTS) (CHECK NO. 2226) ......................................... | | 174.00 |
| APPRAISAL FEE (CHECK NO. 2227) ............................. | | 1,500.00 |
| DICK SUDEROV (NEGOTIATE PAYOFF OF EXISTING SECOND MORTGAGE) (CHECK NO. 2228) ............................... | | 2,000.00 |
| DICK SUDEROV (PAYMENT FOR CABINETS TO BE INSTALLED IN KITCHEN) (CHECK NO. 2229)............................... | | 5,000.00 |
| PHYLLIS SUDEROV (INTEREST ADJUSTMENT FOR MORTGAGE) (CHECK NO. 2255)......................................... | | 143.00 |
| H.R.S. (PROPERTY INSPECTIONS AND CLOSING APPEARANCES) (CHECK NO. 2256)......................................... | | 750.00 |
| RICHARD WIENER (PAYMENT TOWARDS REAL ESTATE COMMISSION) (CHECK NO. 2257) ................................... | | 1,000.00 |
| PHYLLIS SUDEROV (PAYMENT FOR LEASE/PURCHASE OPTION AND FOR ADJUSTMENTS OWING ON THE NEW LEASE) (CHECK NO. 2258)......................................... | | 1,185.87 |
| FINAL TOUCH (PAYMENT TOWARDS REAL ESTATE COMMISSION) (CHECK NO. 2176) ................................... | | <u>500.00</u> |
| TOTAL ................................................. | | <u>25,817.00</u> |

As the statement shows, apart from the FHA arrears, the $25,817.10 is accounted for principally by (1) fees to lawyers and to middlemen and (2) money given Richard and Phyllis Suderov. Checks payable to "HRS," indicating Richard Suderov, total $9,250, and checks payable to Phyllis Suderov total $1,328.87. Among the credits to Richard Suderov is $5,000 to cover kitchen cabinets to be installed in the Davis' house. (That installation has never taken place).

Mr. Naeder, Suderov's attorney, received $1500; Mr. Wiener, the attorney assigned the Davises, received $550. He is also shown as receiving a brokerage of $1,000, to conceal the fact that $1,000 was being paid to Fran who is not a licensed broker and therefore was ineligible for a commission. *See generally*, N.Y.Real Prop.Law § 440, *et seq.* (McKinney 1989). It was the Suderovs' attorney, Mr. Naeder, who inserted Mr. Wiener's name as the broker.

Mrs. Suderov is a sophisticated and experienced lender. She has entered into at

least eight or nine of these sale/lease-back transactions. Currently she owns eight houses and three parcels of vacant land and holds five to six mortgages. What her husband holds was not disclosed. Over the years she has developed form documents and rubber stamps calculated to insulate her transactions from legal challenge.

Significantly, Mr. Suderov never took the witness stand to deny Mrs. Davis' testimony. Her evidence, that he represented to her that the transfer of title to his wife was a mere formality and that it was for the purpose of saving her home for her, was never challenged.

On July 17, 1992, one month after the closing and two weeks after the first rental payment was due, Phyllis Suderov perfected a judgment against the Davises for a full year's rent and costs, $14,779.56. On that same date, she got a warrant of eviction for nonpayment. In addition, Tammy Davis was served by the Suffolk County sheriff with an income execution.

On July 29, 1992 the Debtors filed for relief under Chapter 13. Despite the sale to Phyllis Suderov, the Debtors listed the Bridgehampton house on their petition as their property, and valued it at $75,000. They claimed a homestead exemption in the amount of $20,000. They showed a mortgage on the property to the Farmers Home Administration in the amount of $31,000. Apart from the house, the only nonexempt assets claimed by the Davises is the ownership of a 1988 Cadillac with a value of $12,000, on which $12,500 is owed, on which Mr. Davis claims a $2,400 exemption, and a 1981 Chevrolet pickup truck, having a value of $500. All the other assets shown on the Davises' schedules (cash, clothing, furniture, a pension worth $10,000) are claimed to be exempt.

Amended schedules filed in court show liabilities totalling $9,342.20, including a debt to Phyllis Suderov of $8,058.73, which is described as contingent and unliquidated.

Part of the amended schedules is a Chapter 13 Plan pursuant to which the Davises will pay the Chapter 13 Trustee $207.43 for 60 months. Of this sum, Phyllis Suderov, after the deed to the Debtors' house is returned, is to be paid "all actual expenses of closing ($13,058.73) less payments by Debtors of $5,000 for a total of $8,058.73." All other creditors are to receive 100% of what is owed them. The debt on the Cadillac is reaffirmed.

On August 14, 1992, Dick and Phyllis Suderov filed a claim against the Debtors in the amount of $15,600, of which $14,779.56 is described as secured and $820.44 is described as a priority claim.

Marianne DeRosa was appointed the Chapter 13 Trustee. She has not attempted to avoid the transfer of the Davis' house to Mrs. Suderov.

## DISCUSSION

The Debtors commenced this adversary proceeding pursuant to 11 U.S.C. § 548(a)(2) and § 544(b), and New York's Debtor and Creditor Law § 273. They ask to void the deed transferring the house to Phyllis Suderov and to have the property returned to them pursuant to 11 U.S.C. § 550. They attack the conveyance of their house to Mrs. Suderov as a fraudulent conveyance voidable under 11 U.S.C. § 548(a)(2) and under 11 U.S.C. § 544(b) as violative of New York's Debtor and Creditor Law.

11 U.S.C. 548(a)(2) reads:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation ...

11 U.S.C. § 544(b) allows a trustee to avoid any transfer of an interest of the debtor in property that is voidable under "applicable law" by a creditor holding an allowed unsecured claim. The trustee may

look to state law to avoid such a transfer. New York Debtor and Creditor Law § 273 provides:

> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

A person is insolvent under New York law when the "present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured." N.Y.Debt. & Cred.Law § 271 (McKinney 1990). Under New York law, fair consideration is given when in exchange for the transfer "as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied." N.Y.Debt. & Cred.Law § 272 (McKinney 1990).

If an avoidable transfer is established, Section 550 of the Code authorizes a bankruptcy trustee to recover the property transferred from any transferee who does not take in good faith.[1]

Where a Trustee does not act, a Chapter 13 debtor may avoid a transfer voidable under Sections 544 and 548 to the extent that the debtor could have claimed the property involved as exempt if the transfer sought to be avoided was not a voluntary transfer. 11 U.S.C. § 522. The pertinent portions of Section 522 provide as follows:

> (h) The debtor may avoid a transfer of property of the debtor ... to the extent that the debtor could have exempted such property under subsection (g)(1) of this section if the trustee had avoided such transfer if—

> (1) such transfer is avoidable by the trustee under section 544 ... [or] 548 ... of this title ... and

> (2) the trustee does not attempt to avoid such transfer.

Subsection (g)(1) of Section 522 provides:

> (g) Notwithstanding sections 550 and 551 of this title, the debtor may exempt under subsection (b) of this section property that the trustee recovers under section ... 550 ... of this title, to the extent that the debtor could have exempted such property under subsection (b) of this section if such property had not been transferred, if—

> (1)(A) such transfer was not a voluntary transfer of such property by the debtor; and

> (B) the debtor did not conceal such property; or

> (2) the debtor could have avoided such transfer under subsection (f)(2) of this section.

The bankruptcy courts are in agreement that a debtor may avoid a transfer if 1) it is avoidable by the trustee under Sections 544 or 548; 2) the trustee does not attempt to avoid the transfer; 3) the debtor could exempt the property if the trustee recovered it under section 550; 4) the transfer was involuntary; and 5) the debtor did not conceal the property. *In re Corwin*, 135 B.R. 922 (Bankr.S.D.Fla.1992); *In re Dargis*, 36 B.R. 866, 867 (Bankr.E.D.Pa. 1984); *In re Echoles*, 21 B.R. 280, 281 (Bankr.D.Ariz.1982); *In re Seidel*, 27 B.R. 347, 350 (Bankr.E.D.Pa.1983).

In this case, the Trustee has not attempted to avoid the transfer; the Debtors listed the real property on their petition so it was not concealed; and they have claimed the $20,000 homestead exemption to which

---

1. 11 U.S.C. § 550 provides:
   (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544 ... [or] 548 ... of this title, the trustee may recover, for the benefit of the estate, the property transferred, or if the court so orders, the value of such property, from—
   (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

   (2) any immediate or mediate transferee of such initial transferee.
   (b) The trustee may not recover under section (a)(2) of this section from—
   (1) a transferee that takes for value, including satisfaction or securing a present antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided ...

they are entitled under the Code and New York law.

█ A threshold question which remains is whether the transfer to Phyllis Suderov was a voluntary transfer within the meaning of Section 522(g)(1). The Bankruptcy Code does not define the word "voluntary," *In re Tackett,* 21 B.R. 107 (Bankr.D.N.M. 1982), and the legislative history accompanying § 522(g) sheds no light on its meaning. *In re Seidel,* 27 B.R. 347 (Bankr. E.D.Pa.1983).

By and large, the bankruptcy courts have refused to consider any transfer other than one that takes place by operation of law to be necessarily a voluntary transfer for purposes of Section 522(g)(1). Economic coercion or fraud and misrepresentation have been held to render a transfer involuntary. *In re Seidel,* 27 B.R. 347 (Bankr. E.D.Pa.1983); *In re Taylor,* 8 B.R. 578 (Bankr.E.D.Pa.1981); *In re Reaves,* 8 B.R. 177 (Bankr.D.S.D.1981). The following cases have recognized that general rule, but have concluded that the transfers there at issue were voluntary on the facts: *In re Corwin,* 135 B.R. 922 (Bankr.S.D.Fla.1992); *In re Wernly,* 91 B.R. 702 (Bankr.E.D.Pa. 1988); *In re Wernly,* No. 88–0391S, 1988 WL 96198 (Bankr.E.D.Pa. Sept. 16, 1988); *In re Porter,* 40 B.R. 646 (Bankr.N.D.Tex. 1984); *In re Dargis,* 36 B.R. 866 (Bankr. E.D.Pa.1984); *In re Evingham,* 27 B.R. 128 (Bankr.W.D.N.Y.1983); *In re Tackett,* 21 B.R. 107 (Bankr.D.N.M.1982); *In re Echoles,* 21 B.R. 280 (Bankr.D.Ariz.1982).

*In re Reaves,* applied a two prong test. In that case a debtor had given, pre-petition, a third mortgage on her real property to a bank. An employee of the bank had contacted the debtor, and had pressured the debtor into signing the mortgage by telling her that her estranged husband's business would fail unless she executed the mortgage. The debtor had no legal connection with the business, but was unemployed and dependent solely upon her husband for her income. In considering whether the debtor could avoid the mortgage under Section 522(g)(1), the bankruptcy court stated:

[A]n 11 U.S.C. Section 522(g)(1)(A) voluntary transfer occurs when a debtor, with knowledge of all essential facts and free from the persuasive influence of another, chooses of her own free will to transfer property to the creditor. A voluntary transfer does not occur where a creditor has harassed, insulted, and shamed a debtor into transferring the property to the creditor. Nor has a voluntary transfer occurred where a creditor has concealed or failed to inform a debtor of essential facts necessary for the debtor to make an intelligent decision on whether to transfer the property to the creditor. This is especially true where a debtor can show that she would not have made the transfer had she been informed of all the essential facts.

The court concluded that the debtor had not voluntarily transferred her interest in the real property to the bank. She had signed the mortgage as a result of the pressure applied by the bank and the bank had failed to explain to her the effect of a clause in the mortgage which waived her right to claim a homestead exemption, and the debtor would not have signed the mortgage had she understood the effect of the clause. While a failure to explain the clause would not, standing alone, have been sufficient to justify a holding that the debtor did not voluntarily transfer the property, continual pressure, coupled with a failure to inform the debtor of the consequences of the transfer, resulted in an involuntary transfer.

Other courts have adopted the approach in *Reaves,* or cited it with approval. *In re Corwin,* 135 B.R. 922 (Bankr.S.D.Fla.1992); *In re Evingham,* 27 B.R. 128 (Bankr. W.D.N.Y.1983); *In re Echoles,* 21 B.R. 280 (Bankr.D.Ariz.1982); *In re Tackett,* 21 B.R. 107 (Bankr.D.N.M.1982).

At least one court has gone further, and held that the pressure present in *Reaves* is not prerequisite to a finding of an involuntary transfer where there has been misrepresentation. In *In re Seidel,* 27 B.R. 347 (Bankr.E.D.Pa.1983), the court concluded that a voluntary transfer does not occur where a debtor does not have knowledge of

all of the essential facts pertaining to the transfer, the creditor to whom the transfer is made fails to inform the debtor of any essential facts within the creditor's knowledge, and the debtor would not have made the transfer had he been aware of all of the essential facts.

In *In re Wernly*, No. 88–0391S, 1988 WL 96198 (Bankr.E.D.Pa. Sept. 16, 1988), a Chapter 13 debtor sought to avoid his purchase of a home on the ground that it was a fraudulent conveyance. He contended that the seller and real estate broker had misrepresented the cost of necessary repairs. Recognizing that the purchase could be considered an involuntary transfer where "the wrongdoing on the part of the seller, or the seller's agent, [is] manifest, raising to the level of fraudulent conduct, or [is] at least manifested by the application of extraordinary sales pressure," the court held that in the case before it the transfer was voluntary, because the misstatements "were relatively innocent." *See also In re Wernly*, 91 B.R. 702 (Bankr. E.D.Pa.1988).

The misrepresentations by Richard Suderov, acting on behalf of his wife, can hardly be termed "innocent" and they were accompanied by "extraordinary sales pressure."

In this case there was fraud and misrepresentation, coupled with the economic coercion inherent in the fact that the Davises thought they were facing foreclosure of their mortgage and the Suderovs were aware of that fact.

Considering the totality of the circumstances present here, the transfer to Phyllis Suderov of the deed to the Davis residence was not a voluntary transfer.

What remains to be decided is whether the transfer was a fraudulent conveyance within the meaning of the Bankruptcy Code or New York's Debtor & Creditor Law.

Indisputably, the transfer was made within one year before the date of the filing of the petition. Therefore, it is avoidable under Section 548(a)(2) if (1) the Debtors received less than a reasonably equivalent value for the transfer and (2) they were then or were rendered thereby insolvent.

It is likewise avoidable as a fraudulent conveyance under Section 544 by reference to New York's Debtor and Creditor Law, which parallels the Federal statute and makes fraudulent any conveyance made without a fair consideration which renders the transferor insolvent.

Since the Debtors received nothing for their equity in the house, there can be no question but that they received less than reasonably equivalent value or fair consideration. The defendant, by manipulation of figures, tries to bring herself within the so-called "70 percent rule." Many of the courts which have rejected the argument that the consideration received in a commercially reasonable sale is presumed to be reasonably equivalent in value to the property sold for purposes of Section 548(a)(2)(A) hold that such a sale is only vulnerable if the price received is "less than 70 percent of the market value of the property." *Durrett v. Washington Nat'l Ins. Co.*, 621 F.2d 201 (5th Cir.1980).

Phyllis Suderov, in order to bring the sale within that rule, argues that she paid 70% of the appraised value. She tries to turn into consideration paid the Davises benefits which went to herself and her husband. Insofar as Phyllis Suderov paid off the arrears on the FHA mortgage, or succeeded in obtaining a satisfaction of the forged second mortgage, or took the property subject to the remaining mortgage, the Davises received no benefit since simultaneously they lost the house. The Davises would have been benefitted had they retained the house, but since title to the house passed to Phyllis Suderov simultaneously with removing and reducing the encumbrances on the house, the only one benefitted thereby was the new owner.

Equally of no benefit to the Davises was the money paid out to the Suderovs and their various accomplices in bringing about the ultimate transaction: Mr. Naeder, Fran, Final Touch and Mr. Wiener. The Davises owed them nothing for arranging a transaction presented to them as a way of

avoiding the loss of their home through foreclosure, but which in reality ensured transfer of title to Phyllis Suderov. The only disbursement which arguably was of any benefit to the Davises was the legal fee paid Richard Wiener, who evidently tried to provide such representation to the Davises as the circumstances permitted. But he would have served them better had he, like Mr. O'Shea, refused to participate in the transaction. His presence simply gave an aura of legality to a totally fraudulent and unconscionable transaction.

How little resemblance the closing statement bears to economic reality is best exemplified by the credit Richard Suderov took of $5,000 for cabinets to be installed in the kitchen in the house he was buying. Of what benefit were these cabinets, not yet installed, to the Davises who simultaneously with the transaction lost their house?

The bankruptcy courts in this District have rejected any arbitrary percentage in determining whether reasonably equivalent value was given and have opted for a case-by-case analysis which takes into consideration all of the relevant factors in determining whether the price paid is reasonably equivalent to the value of the property. *In re Pruitt,* 72 B.R. 436 (Bankr.E.D.N.Y. 1987); *In re Adwar,* 55 B.R. 111 (Bankr. E.D.N.Y.1985). As pointed out earlier, the Davises having paid the Suderovs $4,000 in cash and turned over the entire equity in their house, left the closing saddled with an unconscionable lease which committed them to a rent which they could never pay and laid the groundwork for a judgment against them for over $14,000.

■ Whatever criterion is employed and however the facts are examined, it is indisputable that the price paid the Davises for the equity in their home was unconscionably low. How could it be otherwise when the Suderovs emerged with title to the property and with the Davises committed

to pay Mrs. Suderov $1,106 per month for continuing to reside in the property to which Phyllis Suderov now held title and the Davises were left with nothing. Indeed, they were left with less than nothing in the view of the fact that the Suderovs, on one pretext or another, had earlier extracted $4,000 from them. Whatever value is placed on the house, since the Debtors received nothing in exchange for the transfer of their equity, Mrs. Suderov did not give the Debtors reasonably equivalent value. Nor did she give them fair consideration under New York law. N.Y.Debt. & Cred.Law, § 272 (McKinney 1990). Nothing was given the Debtors in exchange for their house "as a fair equivalent therefor," nor did Mrs. Suderov act in good faith.

Because the transfer was so unfair it rendered the Davises insolvent. It stripped them of their one significant asset, their equity in their house and left them with all their prior debts. That the transaction eliminated their liability on the mortgage and on the mortgage arrears was of no benefit since they no longer owned the house.

Section 101(32) of the Code defines the word "insolvent" and this definition has been accepted as the meaning of the term as used in Section 548. *In re Sims,* 112 B.R. 259, 262 (Bankr.N.D.Ill.1990).[2]

■ An individual is insolvent when his debts exceed the value of his exempt property. Before the June 16th closing, the Davises were not insolvent because the equity in their home exceeded their liabilities. After the closing, the only nonexempt asset they possessed was the $500 Chevrolet pickup and the zero equity in the 1988 Cadillac. Except for the fact that they no longer owed FHA anything, their pre-existing debts continued just as before, augmented by a contingent liability to the Suderovs for $12,719, which quickly blossomed into a pre-petition judgment of $14,-

2. Section 101(32) reads:
   (A) with reference to an entity other than a partnership and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—

   (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and
   (ii) property that may be exempted from property of the estate under section 522 of this title ...

779.56. The contingent liability created by the transfer rendered the Davises insolvent under both the Bankruptcy Code and New York law.

■ According to the statutory definition, "debt" means liability on a "claim." 11 U.S.C. § 101(12). A "claim" may be a contingent claim. 11 U.S.C. § 101(5). Therefore, contingent liabilities must be included in the computation of total indebtedness. 2 Lawrence P. King, *Collier on Bankruptcy*, ¶ 101.32[6] (15th ed. 1992). To value a contingent liability for purposes of determining whether a debtor is insolvent, the bankruptcy court must assess the liability from the debtor's perspective and multiply the total debt guaranteed by the probability that the debtor will be required to make good on the guarantee. *Covey v. Commercial Nat'l Bank*, 960 F.2d 657 (7th Cir.1992). In this case, the Davises were almost certain to be called upon immediately to make good on their guarantee, so that the entire amount of their guarantee has to be included in their debts from the moment they signed the Agreement.

■ The New York courts have similarly concluded that a contingent liability, such as that of a guarantor, must be considered in determining solvency under its fraudulent conveyance law. *Marine Midland Bank v. Stein*, 105 Misc.2d 768, 433 N.Y.S.2d 325 (Sup.Ct.1980).

■ The elements of a fraudulent conveyance being demonstrated here the Davises are entitled to avoid the transfer to the extent that it impairs the homestead exemption which is part of their fresh start. The fact that the total value of the real property exceeds the homestead exemption cannot be allowed to take away from the Davises their right to a fresh start. In *In re Pruitt*, 72 B.R. 436 (Bankr. E.D.N.Y.1987), Bankruptcy Judge Holland, in a thoughtful opinion, held that a Debtor was entitled to avoid in its entirety a transfer of his home despite the fact that he was only entitled to a $10,000 exemption. Judge Holland stated:

> The rights of the defendants [the purchasers] to preserve their windfall must be subordinate to the fundamental right

of the debtor. Any other result would do violence to the overriding policy goal of providing the debtor with every opportunity to achieve a "fresh start."

*Pruitt*, at 446.

In the circumstances, Mrs. Suderov is entitled to no more than the return of her money protected by a lien on the real property which is to be returned to the Davises. The Debtors propose to pay her back under a Chapter 13 Plan. They are proposing a Chapter 13 Plan to pay her back over the five years which a Chapter 13 plan may run.

Avoiding the transfer and at the same time giving Mrs. Suderov a lien on the Bridgehampton property and requiring repayment to her over a five year period of her out-of-pocket expenditures, appears to be an appropriate disposition of this matter. It is within the power given the Court by 11 U.S.C. § 105 to issue any order, process or judgment necessary or appropriate to carry out the provisions of Title 11. There is no other way that the Davis' right to a fresh start under Chapter 13 can be protected.

■ There remains the question of the claim against the Davises filed by Mrs. Suderov. Ideally this adversary proceeding should have included an objection to that claim. But the lease cannot survive the voiding of the transfer of the property and the claim should fall with the lease.

■ The Court limited itself to the issue of the existence of a fraudulent conveyance and has not considered whether the entire transaction, including the lease, is voidable as unconscionable. The complaint did not request such a determination. The New York courts will not enforce an unconscionable contract. An unconscionable contract is "one which is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms." *Sablosky v. Edward S. Gordon Co.*, 73 N.Y.2d 133, 538 N.Y.S.2d 513, 535 N.E.2d 643 (1989). The doctrine contains both substantive and procedural aspects, and whether a contract is

unconscionable is to be determined against the background of the contract's commercial setting, purpose, and effect. *Id.* In determining whether a contract is substantively unconscionable, courts consider whether one or more key terms are unreasonably favorable to one party. *Id.*

All the elements of an unconscionable contract are present here, including gross imbalance in bargaining power and sophistication and a result which must shock any disinterested observer. Mr. and Mrs. Suderov, under the pretense of helping the Davises, legally stole from them the house which has been home to them for 15 years and which shelters their children and grandchildren. The Suderovs knew that the moment the Davises committed themselves to pay $1,100 a month, the house was lost to them. The deal into which the Davises were tricked into entering was worse than usurious. All those who participated deserve to be condemned. The Davises should explore recouping from Fran, from Mr. Naeder, Mr. Golub, Final Touch, Mr. Wiener, the money paid them by Mrs. Suderov for helping victimize the Davises.

■ Disregarding the money the Suderovs put in their own pocket and what they paid their own attorney and the persons who had steered the Davises to them, the total amount of money laid out by the Suderovs is $12,238.23. However, they received $4,000 from the Davises. Since the Court is voiding the entire transaction as a fraudulent conveyance, Phyllis Suderov is entitled to receive $8,238.23 back and, consistent with Chapter 13, the Davises are entitled to pay this sum back over the life of their plan with appropriate interest to allow for the delay in the repayment. The Suderovs are also entitled to be subrogated to a lien on the property to protect their right to payment. The Debtors have filed a plan which is consistent with the foregoing but they credit Phyllis Suderov only with being entitled to be paid back $8,058.73 whereas the Court believes the correct amount to be $8,238.73.

## CONCLUSIONS OF LAW

1. This is a core proceeding over which this Court has jurisdiction both of the subject matter and the parties pursuant to 28 U.S.C. § 1334 and § 157(b)(2)(A), (H) and (O).

2. The Debtors have standing to avoid the transfer of their marital residence to the defendant Phyllis Suderov because the transfer was involuntary, the Debtors did not conceal the property, and the Debtors could have claimed a $20,000 homestead exemption of the property had the trustee recovered it as a fraudulent conveyance. 11 U.S.C. § 522(b), (g), (h).

3. Because of the fraud and misrepresentations which induced Mr. and Mrs. Davis to transfer their marital residence it was not a voluntary transfer within the meaning of 11 U.S.C. § 522(g)(1)(A).

4. The transfer by the Debtors of the deed to their house to Phyllis Suderov was a fraudulent conveyance because it was a transfer of their property within the year prior to the filing of the petition for which transfer the Debtors did not receive reasonably equivalent value and which rendered them insolvent. 11 U.S.C. § 548(a).

5. The transfer rendered the Debtors insolvent because it decreased their assets and increased their liabilities by creating a contingent liability of $12,719 which it was almost certain they would have to meet shortly.

6. The transfer was a fraudulent conveyance within the meaning of New York's Debtor & Creditor Law, because it rendered them insolvent and was made without a fair consideration.

7. The Debtors are entitled to avoid the transfer of their marital residence and to recover the deed for it from Phyllis Suderov. 11 U.S.C. §§ 544(b), 548(a), 550.

8. The lease to Tammy Davis cannot survive the transfer of the deed to the property back to the Davises.

9. Equity requires that Phyllis Suderov be recognized as entitled to the return of consideration paid the Davises on June 16, 1992 to be protected by a lien on the

Bridgehampton house until repaid, pursuant to a confirmed Chapter 13 Plan.

Settle judgment in accordance with this Opinion.