**In re Benjamin and Naomi DAVIS, Debtors.**

**Benjamin and Naomi DAVIS, Plaintiffs–Appellees,**

v.

**Phyllis SUDEROV, Defendant–Appellant.**

No. CV 93–0222 (ADS).

Bankruptcy No. 92–72048–21.

Adv. No. 92–7152–21.

United States District Court, E.D. New York.

May 31, 1994.

Bennett & O'Shea (James O'Shea, of counsel), Southampton, NY, for debtors/plaintiffs-appellees.

Heller & Rosenberg, P.C. (Craig S. Heller, of counsel), Huntington, NY, for defendant-appellant.

## OPINION

SPATT, District Judge:

This is an appeal from an Opinion and subsequent Order of the Bankruptcy Court, Judge Cecilia H. Goetz, respectively dated November 18, 1992 and December 23, 1992, granting the appellees' motion to void a sale/leaseback of their marital home to the appellant, on the ground that the transfer of the home was a fraudulent conveyance. The Bankruptcy Court's Opinion is published at 148 B.R. 165 (Bankr.E.D.N.Y.1992), and familiarity with the Opinion is presumed. Jurisdiction over this appeal is premised on 28 U.S.C. § 158.

### FACTUAL BACKGROUND

Judge Goetz's Findings of Facts are fully detailed in her Opinion, and are summarized here.

In 1977 the Davises bought a new house situated on a half acre of land in Bridgehampton, New York for the price of $30,000. To purchase the house and land (collectively the "property"), the Davises borrowed funds from the Farmers Home Administration ("FHA"), and secured the loan by a mortgage against the property. The FHA loan and mortgage were in the amount of $27,000.

In 1982, Mr. Davis moved out of the house. Approximately five years later he initiated divorce proceedings against his wife. At the time the incidents giving rise to this case occurred in 1992, eight people lived in the Davis house: Mrs. Davis, the Davises' two adult daughters, their four grandchildren and a greatgrandson. Mrs. Davis and one of her adult daughters lived on Social Security disability allowances. The other daughter, Tammy Davis, was gainfully employed and earned a salary of approximately $30,000 a year. Also, at that time Mr. Davis' divorce proceedings were still pending. He worked as a hospital orderly.

After Mr. Davis initiated the divorce proceedings, he stopped paying the $195 monthly mortgage payment. By 1991, arrears on the mortgage had accumulated to a total of $10,863. As a result of the arrearage on the mortgage, the FHA threatened foreclosure. Mrs. Davis tried to obtain a second mortgage to pay off the arrears, but was unsuccessful. Through an acquaintance, Mrs. Davis was put in touch with Jules Golub ("Golub") of "Final Touch Funding," a loan broker. Golub arranged to have the appellant's husband, Richard Suderov, contact Mrs. Davis. According to the Bankruptcy Court's findings, the appellant is a sophisticated and experienced real estate lender.

In February 1992, Richard Suderov spoke with Mrs. Davis, and told her he thought he could help her, either by assisting her to obtain a second mortgage or by selling the house. Mrs. Davis stated she did not want to sell the house. Mr. Suderov also explained that he required a $2,000 non-refundable payment as an appraisal fee. Mrs. Davis paid him this amount, from which Suderov paid $500 to Golub. Suderov also used this money to run credit checks against the Davises and their two adult daughters.

Despite Mrs. Davis' statement that she did not want to sell the house, Mr. Suderov arranged for the house to be sold to his wife. The Suderovs' attorney, Daniel Naeder ("Naeder"), arranged for a closing at his offices on April 9, 1992. The day before the closing Mrs. Davis' attorney, James O'Shea ("O'Shea"), reviewed the closing documents. He informed her that the transaction would

result in her selling the house to the Suderovs and inquired whether this was her intention. Mrs. Davis stated she did not want to sell the house. O'Shea told Mrs. Davis that a better solution to her problems would be to file for bankruptcy protection under Chapter 13 of the Bankruptcy Code. He also told Mrs. Davis that he would not represent her at the closing because the net result of the transaction she was about to enter into would be a sale of the house and property.

Mr. Suderov called Mrs. Davis the night before the closing. When told by Mrs. Davis of O'Shea's remarks and recommendation, Suderov represented to Mrs. Davis that transferring title to the property was just a formality necessary to satisfy the FHA, and that she would get the house back after the closing. According to the Bankruptcy Court's findings, since O'Shea was unwilling to represent her Mr. Suderov told Mrs. Davis he would get her another lawyer.

The next day, April 9, 1992, the Davises arrived at Naeder's office for the closing. Richard Wiener ("Wiener") introduced himself to the Davises as their attorney. The closing was postponed until another day, however, because Mr. Davis had not brought money to the closing to pay Wiener, and Wiener was dissatisfied with some of the closing documents. At this time Mr. Suderov also demanded another $2,000 from the Davises as a result of work he had done to satisfy a second mortgage recorded against the house by Sterling Resources in the amount of $14,000. The record shows that this purported second mortgage was to secure payment for the installation of aluminum siding on the house. The Davises paid Suderov the additional $2,000 in June, 1992.

On June 16, 1992 the closing took place at Naeder's office. Present were the Davises and their attorney Wiener, the Davises' daughter Tammy, the Suderovs and their attorney Naeder, Golub, the original acquaintance of Mrs. Davis who placed her in touch with Golub, and a representative of a title company. The closing documents prepared by Naeder consisted of (1) a deed transferring title to the property to Phyllis Suderov, and (2) a twelve page agreement entitled "Agreement With Option to Purchase" between Phyllis Suderov as owner/seller and Tammy Davis as purchaser (the "Lease" or "Agreement"). Annexed to the Agreement were: (i) an "Agreement Receipt and Statement," setting forth the transaction purchase price and credits against the purchase price resulting from costs incurred by Mrs. Suderov to acquire the property, (ii) a "Memorandum of Municipal Requirements," and (iii) an "Insurance and Option Memo Excerpt." The Bankruptcy Court found that the Agreement was both a lease and an option to repurchase the property, and that the transaction documents essentially entailed the Davises selling their property to Phyllis Suderov, followed by a leaseback of the premises to Tammy Davis with the Davises as guarantors of the rent payments.

Under the terms of the transaction documents, execution of the Lease generated an immediate obligation on Tammy Davis's part to pay a year's rent—$12,719, approximately one half of her gross income—in monthly installments of $1,106. Default entitled Suderov to an acceleration of the yearly rent payment, which was guaranteed by the Davises. The Lease term was for one year, renewable annually five times. The Lease also included an option allowing Tammy Davis to repurchase the premises at any time during the five years. This option did not, however, include repurchase of the fixtures in the home that were being sold to Mrs. Suderov, such as the washing machine, dryer, dishwasher, refrigerator and television. The cost for repurchasing the home in the first year was $56,500, and increased yearly. The Bankruptcy Court estimated that by the fifth year, repurchase of the house would cost Tammy Davis $109,000.

The Bankruptcy Court found that since 1977, the value of the Davises' house and property had appreciated. Appraisals for 1992 ranged from $55,000 to $85,000. Depending on the appraisal used, the Judge Goetz determined that in 1991 the Davises' equity in their home ranged from somewhere between $19,200 and $49,200. The FHA mortgage had been reduced by that time to approximately $24,600.

Although the Davises had equity in their home, the Bankruptcy Court found that they

did not receive any money for selling their home to the Suderovs. According to a statement included in the closing documents which was prepared by Naeder, the Davises were to receive $24,000 for the sale of their home to Phyllis Suderov. However, set-off against this purchase price were $25,817 in "expenses and costs" that allegedly should have been borne by the Davises as sellers, but which were purportedly incurred by Mrs. Suderov. The Bankruptcy Court noted that except for the $10,863 to pay back the FHA arrears, the remainder of these expenses were for attorney's and broker fees, or payments by Phyllis Suderov to her husband for services rendered which appeared questionable. One such payment was a check to Richard Suderov in the amount of $5,000, for the installation of kitchen cabinets that the Bankruptcy Court found had never been installed. The Bankruptcy Court also found that this statement of expenses and costs was never shown to the Davises.

Judge Goetz further determined that the transaction documents were "unintelligible," and that Wiener, the attorney representing the Davises, did not fully understand the complexity of the transaction and could not have adequately explained it to his clients. Indeed, it was not until the hearing before the Bankruptcy Court that Wiener realized a leaseback of the home was involved in the transaction. At the closing, Mr. Suderov again reiterated to Mrs. Davis that transferring title to his wife was necessary to satisfy the FHA, that he really did not want the Davises' home, and that the Davises would get their house back after the closing. The Bankruptcy Court found that these statements were not true, and were misrepresentations asserted by Mr. Suderov in order to obtain title to the property from the Davises. The Bankruptcy Court also found that Mrs. Suderov had entered into at least eight or nine similar sale/lease-back transactions previously, that she owned eight houses, three parcels of land, and that she held five to six mortgages. According to the Bankruptcy Court's findings, the Davises relied on the misrepresentations of Mr. Suderov, and signed the transaction documents without ever understanding what was occurring.

On July 17, 1992, one month after the closing and two weeks after the first rental payment had become due and owing, Phyllis Suderov perfected a judgment against the Davises for a full year's rent and costs, in the amount of $14,779.56. On that same day, Mrs. Suderov also obtained a warrant of eviction for non-payment of rent against the Davises—that is, against Mrs. Davis, her daughters and grandchildren who were all living in the home on Social Security disability allowances. In addition, the Suffolk County sheriff served an income execution on Tammy Davis.

The Davises sought temporary relief in a local court, and on July 29, 1992, Mr. and Mrs. Davis filed a petition for relief under Chapter 13 of the Bankruptcy Code. Despite the sale of their home, it was listed as part of their property on the petition for relief. The Davises valued the home at $75,000, and listed a $20,000 homestead exemption on the property pursuant to 11 U.S.C. § 522(b)(2). The only other nonexempt assets the Davises listed in their petition were a 1988 Cadillac valued at $12,000, on which $12,500 was owed, and a pick-up truck valued at $500. The Davises claimed a $2,400 exemption with respect to the Cadillac.

The Suderovs filed a claim in the bankruptcy against the Davises for the amount of $15,600. This claim included the $14,779.56 representing the first year's rent of their home. Although a Chapter 13 Trustee was appointed for the Davises, the Trustee did not attempt to void the transfer of the Davises' property to Mrs. Suderov.

The Suderovs moved to lift the automatic stay on August 15, 1992, in order to proceed with the eviction of the Davises. Judge Goetz heard the application, and told the parties that the matter would be resolved by the debtors commencing an adversary proceeding to set aside the transfer of their property to Mrs. Suderov. On September 23, 1992 the Davises commenced an adversary proceeding against the Suderovs. Their complaint sought to void the deed transferring the property to Phyllis Suderov as a fraudulent conveyance pursuant to 11 U.S.C. § 548(a)(2), 11 U.S.C. § 544(b) and New York Debtor and Creditor Law § 273, and

requested the return of their property pursuant to 11 U.S.C. § 550.

## BANKRUPTCY COURT'S DECISION

After conducting a bench trial of the adversary proceeding on October 30, 1992 and November 6, 1992, the Bankruptcy Court determined that the sale/leaseback transaction entered into by the parties was a fraudulent conveyance. The Bankruptcy Court then voided the transfer of the deed to Phyllis Suderov as well as the Lease agreement between Mrs. Suderov and Tammy Davis. Judge Goetz also determined that the transaction in its entirety was unconscionable.

The Bankruptcy Court's decision was made on the basis of 11 U.S.C. §§ 522(g) and (h). Those subsections provide in relevant part:

> (g) [T]he debtor may exempt under subsection (b) of this section property that the trustee recovers ... to the extent the debtor could have exempted such property under subsection (b) of this section if such property had not been transferred, if—
>
>> (1)(A) such transfer was not a voluntary transfer of such property by the debtor; and
>>
>> (B) the debtor did not conceal such property.
>
> . . . .
>
> (h) The debtor may avoid a transfer of property of the debtor ... to the extent that the debtor could have exempted such property under subsection (g)(1) of this section if the trustee had avoided such transfer, if—
>
>> (1) such transfer is avoidable by the trustee under section 544 ... [or] 548 ... of this title ... and
>>
>> (2) the trustee does not attempt to avoid such a transfer.

Section 522(b), which is referenced by section 522(g), authorizes the debtor to exempt from property of the estate any property of the debtor (1) that is listed in section 522(d), or (2) that is exempt from estate property under state law.

Sections 544(b) and 548(a)(2) of the Bankruptcy Code, which are referenced by section 522(h), permit the voiding of fraudulent transfers. Section 544(b) provides that the trustee may void any transfer of a debtor's property interest that is "voidable under applicable law" by an unsecured creditor. New York Debtor and Creditor Law § 273 applies by reference to section 544(b). Section 273 permits the voiding of a debtor's transfer of property, if the transfer is fraudulent as to a creditor. Debtor and Creditor Law § 273 states:

> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

Section 548(a)(2) of the Bankruptcy Code is similar in nature to Debtor and Creditor law § 273. Section 548(a)(2) states that:

> The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
>> (2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>>
>> (B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation. . . .

The interplay of these statutes permits a debtor to set aside an involuntary transfer of real property that is deemed a fraudulent conveyance because it leaves the debtor insolvent. Judge Goetz summarized this statutory interplay as follows:

> [A] debtor may avoid a transfer if 1) it is avoidable by the trustee under sections 544 or 548; 2) the trustee does not attempt to avoid the transfer; 3) the debtor could exempt the property if the trustee recovered it under section 550; 4) the transfer was involuntary; and 5) the debtor did not conceal the property.

*See* 148 B.R. at 172 (citing cases).

Judge Goetz held that the Chapter 13 Trustee did not attempt to void the transfer

of the deed to Suderov, that the transferred property was subject to the homestead exemption under the Bankruptcy Code and New York State Law, and that the Davises did not conceal the property because it was listed in their bankruptcy petition schedule. As a result, the primary focus of Judge Goetz's decision was to determine whether the transfer to Phyllis Suderov was voluntary, and whether it was a fraudulent conveyance because it left the Davises insolvent.

The Bankruptcy Court found that the Davises involuntarily transferred their deed to Phyllis Suderov, because they were not aware of all the essential facts relating to the transaction, and they would not have entered into the transaction but for Mr. Suderov's fraudulent misrepresentations. The court also held that, because of the threatened foreclosure on their property, the Davises were economically coerced when they transferred their property.

The Bankruptcy Court also determined that the transfer was a fraudulent conveyance because the Davises did not receive a fair consideration for the sale of the house, and were left insolvent as a result of the transaction. Judge Goetz determined that the Davises did not receive fair consideration because they were not paid "a penny" for their equity in the home. The court rejected Phyllis Suderov's argument that the consideration given to the Davises consisted of the satisfaction of the FHA mortgage arrears, assumption of the remaining mortgage and the various fees and payments credited to Mrs. Suderov's purchase price. The Bankruptcy Court held that since title was transferred to Phyllis Suderov, satisfaction of the mortgage and other encumbrances on the property, as well as the payment of the closing costs benefited Suderov and could not constitute consideration. Judge Goetz concluded that in exchange for $4000 and the equity in their home, the Davises "left the closing saddled with an unconscionable lease which committed them to a rent which they could never pay and laid the groundwork for a judgment against them for over $14,000." *In re Davis,* 148 B.R. 165, 175 (Bankr. E.D.N.Y.1992).

Following the definition of "insolvent" provided in section 101(32) of the Bankruptcy Code, 11 U.S.C. § 101(32), which defines "insolvency" as the state of a person's debts exceeding the value of their non-exempt property, Judge Goetz found that the Davises were rendered insolvent as a result of the transaction. According to Judge Goetz, the Davises were rendered insolvent because they had given up their primary asset, the equity in their home, but still retained all of their other pre-existing at the end of the deal, except the mortgage arrears, plus a contingent liability of $14,779 for the yearly rent which was certain to become due and owing.

The Bankruptcy Court accordingly voided the transfer of the property and the Lease agreement. The court determined, however, that Phyllis Suderov held a claim against the debtors' estate in the amount of $8,238. This figure represented the payment for the arrears on the mortgage and certain other out-of-pocket closing expenses the court found legitimate, off-set by the $4,000 paid by the Davises to Suderov. Under the Davis' Chapter 13 plan, the Davises were to pay this amount to Phyllis Suderov over the next five years.

**PRESENT APPEAL**

Phyllis Suderov has appealed the decision of the Bankruptcy Court, and essentially contests every finding made by Judge Goetz. Suderov raises the following issues on appeal:

1. Whether the Bankruptcy Judge properly determined the Findings of Fact as they related to the necessary Conclusions of Law;

2. Whether the transfer of the real property by the debtors was a voluntary transfer within the meaning of 11 U.S.C. section 522(g)(1)(A);

3. Whether the transfer of the deed by the debtors to Phyllis Suderov was a fraudulent conveyance within the meaning of 11 U.S.C. section 548(a);

4. Whether the transfer rendered the Debtors insolvent;

5. Whether there was reasonably equivalent value for the real property in the transaction;

6. Whether the Bankruptcy Court has the authority to void the lease agreement between Phyllis Suderov and Tammy Davis, a non-debtor;

7. Whether the Bankruptcy Court properly reduced the claim of Phyllis Suderov to $8,238.73.

Specifically, Suderov contends that Judge Goetz made the following erroneous rulings in her findings of fact, which in turn affect the validity of the legal conclusions based on these factual findings:

A. That the second mortgage of Sterling Mortgage was invalid because the signature of Mr. Davis was forged.

B. That Mr. Suderov told Mrs. Davis that he would get her an attorney and that, in fact, he retained Mr. Richard Wiener for her.

C. That Mr. Suderov stated that transfer of title of the real property was necessary to satisfy the FHA.

D. That Mrs. Davis' testimony that transfer of title to Mrs. Phyllis Suderov was a mere formality and was for the purpose of saving her home, was unchallenged.

E. That the transfer was of no benefit to the Davises.

F. That the transfer could not have been for reasonable value since the Davises gave up all of their equity in this property.

G. That the Davis' were "almost certain" to be called upon immediately to make good on their guarantee of the lease agreement.

## DISCUSSION

*Standard of Review.*

Rule 8013 of the Federal Rules of Bankruptcy Procedure establishes the standard for a district court's review of a bankruptcy court's order or judgment. Rule 8013 provides as follows:

On an appeal the district court . . . may affirm, modify, or reverse a bankruptcy court's judgment, order or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

While the bankruptcy court's findings of fact may not be set aside by the district court unless clearly erroneous, the bankruptcy court's legal conclusions are reviewed *de novo.* *Shugrue v. Air Line Pilots Assoc, Int'l (In re Ionosphere Clubs, Inc.),* 922 F.2d 984, 988 (2d Cir.1990); *In re Southold Development Corp.,* 134 B.R. 705, 708 (E.D.N.Y. 1991).

■ A finding is clearly erroneous "when, although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed." *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *Metzen v. United States,* 19 F.3d 795, 797–98 (2d Cir. 1994); *Southold Development,* 134 B.R. at 708 n. 3. If the bankruptcy court's account of the evidence is plausible in light of the record viewed in its entirety, the district court may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Metzen,* 19 F.3d at 797 (quoting *Bessemer City,* 470 U.S. at 573–74, 105 S.Ct. at 1511). Moreover, when findings are based on determinations regarding the credibility of witnesses, even greater deference to the bankruptcy court's findings is warranted. *Id.*

The bankruptcy court, however, may not insulate its findings from review by denominating them as credibility determinations. "[F]actors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story. . . . Where such factors are present, the [district court] may well find clear error even in a finding purportedly based on a credibility determination." *Id.*

■ Finally, on appeal from an order of the bankruptcy court, the district court should not consider any evidence not before the bankruptcy court at the original hearing. *See Matter of Silverman,* 6 B.R. 991 (D.N.J. 1980); *Union Bank v. Blum,* 460 F.2d 197 (9th Cir.1972).

### 1. The Bankruptcy Court's Findings of Fact.

#### A. *Mr. Davis' Forged Signature.*

Suderov contends that there was insufficient evidence produced at trial to conclude that the alleged second mortgage on the home held by Sterling Resources was forged, and therefore invalid.

During the trial, there was testimony about this mortgage from both Mr. and Mrs. Davis. During his cross-examination, Mr. Davis stated that he questioned the validity of the Sterling mortgage:

Q You were also aware of the fact that there was a second mortgage on the property Mr. Davis?

A No, I wasn't aware of that. No, I wasn't.

. . . .

Q You weren't advised at the closing that there had been a second mortgage on the property, or prior to the closing?

A Maybe they did bring it up at the closing, because I questioned it there, because I don't know how it could have been, because this aluminum company forged my name on that house. My attorney got in touch with them.

Q Who is your attorney, what attorney, sir?

A Susan Burnside in Bridge Hampton. She got in touch with them and they were supposed to have cancelled the whole thing out. How it came up with Mr. Suderov, I don't know. My wife was told she didn't have to make anymore payments, because I was getting ready to sue them. Somebody forged my name on that thing. I wasn't even living in the house. They said that I signed. They sent me a payment book. I never even talked to them about that.

Q You were going to bring legal proceedings regarding that?

A I don't know how this came up again. They said that thing was over. They said that was closed.

*October 30, 1992 Transcript,* pp. 45–46. Mrs. Davis testified on direct examination that the contractor who installed the aluminum siding forged Mr. Davis' signature on the mortgage:

Q There was a mortgage on the property with Sterling Resources, can you tell us what was that about?

A Sterling Resources gave Harris, this is the contractor, Harris, they gave them, they put aluminum siding on the house. They paid him this money. I, myself, never, I knew that I had to pay them. I was waiting for them to come to me. The payment books and everything. Instead the payment book went to Benny. He didn't know anything about it. His lawyer looked it and found that Benny's name was forged from Harris.

Q Did Resources ever commence a foreclosure action against you.

A No.

Q Did Sterling resources ever commence any type of action against you?

A No.

*October 30, 1992 Transcript,* pp. 82–83.

The Suderovs did not seek to controvert any of this testimony, either by testimony or by an examination of the relevant documents and Mr. Davis' signature. In light of the record, in this Court's view the Bankruptcy Court's finding that the Sterling Mortgage contained the forged signature of Mr. Davis is plausible. The Court is not left with "the definite and firm conviction that a mistake has been committed" by the Bankruptcy Court's finding with respect to this issue.

#### B. *Attorney Wiener's Retention.*

Suderov next contends that it was erroneous for the Bankruptcy Court to find that on the evening before the first attempted closing on April 9, 1992, Mr. Suderov told Mrs. Davis that he would get her another lawyer. The Davises contend that Wiener, the attorney who represented them at the closing, was supplied by the Suderovs, while Suderov

maintains that Wiener was referred to the Davises by Golub.

A review of the record indicates that according to the testimony of Mrs. Davis and Wiener, it was Golub—referred to by Mrs. Davis as "Mr. George"—who said to Mrs. Davis in a phone call at approximately 10:30 p.m. on April 8, 1992 that he would get her another lawyer to represent her at the closing the next day. *See October 30, 1992 Transcript*, pp. 71, 87, 139–140. Indeed, a review of the record indicates that no one testified that Mr. Suderov told Mrs. Davis that he would get her another lawyer. Accordingly, the Court finds that the Bankruptcy Court's finding of fact, that Mr. Suderov told Mrs. Davis on April 8, 1992 that he would get her another lawyer, is clearly erroneous. However, the Court further finds that this error does not affect any of the Bankruptcy Court's legal conclusions.

### C. *Transfer of Title to Satisfy the FHA.*

Suderov takes issue with the Bankruptcy Court's finding that Mr. Suderov led Mrs. Davis to believe that transferring title to the property was just a formality necessary to satisfy the FHA.

In this Court's view, a review of the record indicates that it is more than plausible that Mrs. Davis believed she was not losing her house, but rather was entering into a transaction that Mr. Suderov had structured with the approval of the FHA and United States Attorneys Office to satisfy the FHA mortgage arrears. She testified as follows:

Q Did you think it was an agreement with an option to purchase?

A No, because he told me he was not trying to get my house.

Q Again, I am going to ask you what did you think was happening at the closing there?

A All I thought I was signing something for the second mortgage to pay him back. The second mortgage he had taken out, that he had sent this money to Farmers Home. I really believed it because the United States Attorney, Hillary Firestone, called me and congratulated me and said I know you want your house, you need your

house and I am glad you got it straightened out. This was the whole time until he is talking about taking my house, I got this from a letter that he sent to Mr. O'Shea. I did not know this is what he was doing. He had never discussed it with me until after I found out. He told me I am not trying to take your house. I said that is what your lawyer said. He said you have signed these papers and four to six months you will be able to get a mortgage, the firm was supposed to do that, to pay him the money that he spent and I continue to keep my house. This is what he told me at the closing.

*October 30, 1992 Transcript*, at 80–81. Indeed, the Court notes that during her testimony Mrs. Davis stated Mr. Suderov told her "that in order to do what he had to do," she would have to sign over the deed to her house, *see, e.g., October 30 Transcript*, at pp. 147, 149, and that transferring the deed was part of a "deal" with the FHA:

A Mr. Suderov said that in order to do what he had to do, that we would have to sign the deeds. This is what he told me. This is what he told Farmers Home because they sent us a letter—

Q Wait one moment.

THE COURT: Don't cut her off. Let her finish.

A This is what he told me. This is the deal he made with the United States Attorney General Firestone. This is what I thought. I had no idea that it was going this, that he was going to do this in two weeks time.

*October 30 Transcript*, pg. 149.

The Court is not left with the firm conviction that the Bankruptcy Court committed a mistake in finding that Mrs. Davis was led to believe by Mr. Suderov that the transfer of the deed was necessary in order to satisfy the FHA. Accordingly, the Bankruptcy Court's finding in this regard is not clearly erroneous.

### D. *Mrs. Davis' Testimony Was Unchallenged.*

The appellant also contends that the Bankruptcy Court erred in finding that Mrs.

Davis' testimony that transfer of the house to Phyllis Suderov was a mere formality and was for the purpose of saving her home, was unchallenged. According to the appellants, the testimony of Phyllis Suderov, Wiener and Naeder refute the bankruptcy court's finding. The Court disagrees.

The testimony of each of these persons shows, at best, that Wiener explained to the Davises that they would be selling their house. The bankruptcy court found, however,—and the appellants do not contest this finding—that Wiener himself did not fully comprehend the nature of the transaction at the time of the closing. Moreover, the appellants admit that Judge Goetz had a basis for finding that the Davises believed they would receive their house back after the transaction. *See* Appellant's Memorandum of Law at 13 and 14. No part of the testimony of these three persons addresses the issue that the Davises were under the impression that the transfer of their property to Phyllis Suderov was only a formality to satisfy the FHA. Nor, in the Court's view, can it be reasonably inferred that the testimony of these three persons refutes Mrs. Davis' testimony.

Accordingly, the Bankruptcy Court's finding that the appellants never challenged Mrs. Davis' testimony regarding her belief that the sale of the house was a mere formality necessary to save her home, is not clearly erroneous.

The remaining three challenges by Suderov to Judge Goetz's Findings of Fact, namely whether the transfer benefitted the Davises, was for a reasonable value, and whether the Davises were "almost certain" to be called upon immediately to make good on their guarantee of the Lease, involve mixed questions of law and fact, and are discussed below under the appropriate legal issue.

### 2. The Bankruptcy Court's Conclusions of Law.

#### A. *The Transfer of the Davis Property Was Involuntary.*

The Bankruptcy Court determined that, considering the totality of the circumstances, the Davises' transfer of the property to Phyllis Suderov was not voluntary. According to the Judge Goetz, Mr. Suderov's misrepresentations coupled with the Davises' lack of knowledge of the essential nature of the transaction, and the economic coercion inherent in the threat of foreclosure against the Davises all worked to make the transfer involuntary. The Bankruptcy Court found that had the Davises known of all the essential facts they would not have entered into the transaction.

Suderov contends that the Bankruptcy Court erred in holding that the transfer of the property by the Davises was an involuntary transfer within the meaning of 11 U.S.C. § 522(g)(1)(A). According to Mrs. Suderov, the Davises knew all along that they were selling their property to her, and there were no misrepresentations made to the Davises about the transaction. Moreover, Suderov contends "there is not a scintilla of evidence that the debtors were pressured into this deal." Appellant's Memorandum of Law at 20. Based on these contentions, Suderov contends that the transfer of the property was voluntary.

■■■ The Burden of proving that the transfer was not voluntary is on the debtors. *In re Corwin*, 135 B.R. 922, 924 (Bankr. S.D.Fla.1992); *In re Trevino*, 96 B.R. 608, 613 (Bankr.E.D.N.C.1989). The Bankruptcy Code does not define the term "voluntary" for purposes of a transfer under sections 522(g) and 522(h). The legislative history provides one example of an involuntary transfer: the fixing of a judicial lien. *See* H.R.Rep. 595, 95th Cong., 1st Sess. 362 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6318. The purpose behind disallowing voluntary transfers of property made by the debtor from the exemption under section 522(g) is to prevent the debtor from receiving a windfall which would enable him to benefit from his own voluntary act. *In re Via*, 107 B.R. 91, 94 (Bankr.W.D.Va.1989).

Following the example given by the legislative history, courts have determined that an involuntary transfer occurs when the property is transferred by operation of law, such as by means of an execution of judgment, repossession, or garnishment. *See Trevino*, 96 B.R. at 613; *In re Washkowiak*,

62 B.R. 884, 886 (Bankr.E.D.Ill.1986). In this type of situation the transfer is deemed involuntary because it is beyond the debtor's personal control. *Id.; see also Matter of Huebner*, 18 B.R. 193, 195 (Bankr. W.D.Wisc.1982).

In addition, courts recognize that an involuntary transfer of property may occur under circumstances that, although not beyond the debtor's control, involve fraud, material misrepresentation or coercion. According to this standard, a "voluntary" transfer occurs,

> when a debtor, with knowledge of all essential facts and free from the persuasive influence of another, chooses of her own free will to transfer property to the creditor. A voluntary transfer does not occur where a creditor has harassed, insulted, and shamed a debtor into transferring the property to a creditor. *Nor has a voluntary transfer occurred where a creditor has concealed or failed to inform a debtor of the essential facts necessary for the debtor to make an intelligent decision on whether to transfer the property to the creditor.* This is especially true where a debtor can show that she would not have made the transfer had she been informed of all the essential facts.

*In re Reaves,* 8 B.R. 177, 181 (Bankr.D.S.D. 1981) (emphasis supplied). *See also Corwin,* 135 B.R. at 924; *In re Hoffman,* 96 B.R. 46, 47–48 (Bankr.W.D.Pa.1988); *In re Seidel,* 27 B.R. 347, 352 (Bankr.E.D.Pa.1983).

In *Reaves,* the defendant bank contacted the debtor, and told her that a third mortgage was needed on her homestead in order to secure check overdrafts by her husband's business and a personal loan made to him. The debtor and her husband were separated. She was unemployed and dependent upon him for her income. The bank knew that the debtor had no connection to her husband's business, and was not legally obligated to secure the debt. Although the debtor refused to sign a third mortgage, the bank continued to apply pressure to get her to sign, at one point telling the debtor that if she didn't sign the mortgage her husband's business would fail. Eventually, the debtor succumbed and signed the mortgage. The bank also failed to explain to the debtor that by signing the mortgage, she extinguished her equity in the homestead.

The court in *Reaves* found that the third mortgage in favor of the bank was an involuntary transfer and a fraudulent conveyance, because the bank had applied pressure on the debtor in such a way as to "break [her] spirit and convince her to sign," *id.* at 181. Moreover, the bank had failed to explain to the debtor the full consequences of signing the third mortgage. According to the *Reaves* court, had the debtor known that she was extinguishing her equity in the property, she would not have signed the mortgage.

Similarly, in *Seidel,* the debtor returned a partially paid truck to the bank. The court voided the transfer of the debtor's truck to the bank, because the debtor was not informed by the bank that by returning the truck he would lose his equity in the truck. The *Seidel* court found that even though the bank did not exert any pressure on the debtor to return the truck, the transfer was involuntary because the debtor would not have returned the truck had the bank informed him that by doing so his equity would be lost.

The facts of this case are similar to those in *Reaves* and *Seidel,* and in this Court's view the Bankruptcy Court correctly determined that the Davises did not voluntarily transfer their property to Phyllis Suderov within the meaning of section 522(g)(1). The record amply shows that the Davises did not know all of the material facts of the transaction, that misrepresentations were made to them by Mr. Suderov, and that they were under considerable pressure to transfer the property. Moreover, it is clear that if the Davises had been made aware of the true nature of the transaction, then they would have not transferred the property to Mrs. Suderov.

Mrs. Davis repeatedly stated that she did not want to sell her house. She transferred this valuable, irreplaceable asset Phyllis Suderov only because of the misrepresentations by Mr. Suderov that the Davises would get the house back after the closing. The Davises were under the impression that Suderov

had worked out a deal with the FHA that required the house being sold as a mere formality to satisfy the FHA mortgage, and they believed that they would get their house back after the closing. Mr. Suderov told them that they would get their house back, even though he knew that this was not true. Had the Davises known that they would not be getting their property back after the closing they would not have transferred title to Mrs. Suderov.

Moreover, there is ample evidence in the record to show that the Davises were under pressure to execute the transfer. Apart from the significant coercion they faced as a result of the threatened foreclosure on their home, which led them out of desperation to the Suderovs in the first place, the closing transaction occurred under tremendous pressure. Mrs. Davis recounted the scene at the closing:

> Tammy got very upset and Tammy cried and she left.... Everything was done so fast, sign this, sign this. The title man was there. He had a six o'clock appointment it was his son's birthday and he was rushing and I was questioning this thing because I really didn't want to do it. They kept on pushing me and pushing me and saying this and that.
>
> ....
>
> Q Before you signed any of the documents, did Mr. Wiener explain to you what the documents were that you were signing?
> A No. All that came, all that I heard was rush, rush. Everybody was upset, sign this, sign this and sign this. We didn't have a chance to read nothing. When it got to Tammy, Tammy said what am I signing for. Sign this, we have to go because we have been here so long. Tammy got real upset because they wouldn't answer her questions. They came along, sign this and initial this and sign this and initial this
> Q Mrs. Davis, when you signed the agreement with option to purchase, was it ever explained to you by Mr. Wiener?
> A No, I just told you. They did just like you did, sign here, sign here, turn the page, sign here. Benny sign here. Tam-

my, sign here. It was nothing ever explained to me. All Mr. Suderov was doing was calling figures. Mr. Wiener was going around getting us to sign. There wasn't nothing explained, nothing.

*October 30, 1992 Transcript* at 72, 146–47, 151. Mr. Wiener himself described the pressure the Davises were under as follows:

> I remember her daughter left at least once and perhaps twice in tears, that is Mrs. Davis daughter. We went over the transaction action. I explained it to them as best I could. *It was not your typical transaction.*
>
> ....
>
> THE COURT: Did you explain to them that if they didn't pay the rent that was called for they would lose the house and be evicted.
>
> THE WITNESS: Absolutely.... I explained that to them. I believe they were aware of it. They were also up against the wall because I think they were facing a foreclosure. They felt that they had nowhere to turn. This was the only thing that would keep them afloat. They were aware, they were upset. As I say the daughter left the room several times in tears and came back. There they were.
>
> ....
>
> *They were under tremendous stress. There is no question about that in my mind.* As I said, the daughter left and came back at least twice. She was crying, almost hysterically, not quite hysterically. The husband didn't want to close several times. Mr. Davis was on the verge of walking out. They were under a lot of stress, there is no question about that in my mind.

*October 30, 1992 Transcript* at 90, 92, 96 (emphasis supplied).

Finally, the Court notes that the reason underlying the disallowance of voluntary transfers from exemption is not implicated in this case. The Davises are not making a monetary windfall by having transferred their property to Mrs. Suderov, and then regaining it by voiding the transfer.

Accordingly, Judge Goetz did not err as a matter of law in her determination that the Davises involuntarily transferred their property to Phyllis Suderov within the meaning of section 522(g)(1)(A).

### B. *The Sale/Leaseback was a Fraudulent Transfer.*

Having decided that the transfer was involuntary, the Bankruptcy Court next considered whether the transfer was a fraudulent conveyance within the meaning of Sections 548(a)(2) and 544 of the Bankruptcy Code.

Section 548(a)(2) provides that a transfer of the debtor's property can be avoided, if the transfer occurred within a year of the debtor's bankruptcy petition and (1) the debtor received less than a "reasonably equivalent value" for the property, and (2) the debtor was rendered insolvent by the transfer. Similarly, by reference to New York Debtor and Creditor Law § 273, section 544(b) of the Bankruptcy Code allows a transfer of the debtor's property to be avoided if the debtor does not receive "fair consideration" and is insolvent or is rendered insolvent by the transfer.

### (i) *Reasonably Equivalent Value and Fair Consideration.*

Judge Goetz determined that the Davises received less than reasonably equivalent value or fair consideration for the transfer, because they received nothing for their equity in the home. Indeed, Judge Goetz found that the Davises were left with less than nothing after the transfer, because they had paid the Suderovs $4,000 in cash.

In arriving at its determination that the Davises did not receive anything for the equity in their home—estimated by the Judge Goetz to range from somewhere between $19,260 and $49,260, depending on the appraisal value of the property—the Bankruptcy Court rejected Mrs. Suderov's contention that she had given reasonably equivalent value and fair consideration to the Davises by paying-off the FHA mortgage arrears, satisfying the second mortgage, taking the property subject to the existing mortgage, paying the broker and attorney's fees at the closing, and paying the expenses for other services rendered by Mr. Suderov. According to the

Bankruptcy Court, none of these payments benefited the Davises, because the Davises simultaneously lost their house. Rather, since title passed to Phyllis Suderov, Judge Goetz determined that the removal and reduction of the encumbrances on the house benefitted the new owner of the home, Suderov herself.

Suderov contends that Judge Goetz erroneously determined, both as a finding of fact and conclusion of law, that the transfer was of no benefit to the Davises, and that the transfer could not have been for reasonable equivalent value because the Davises lost their equity in the property. On appeal, Suderov raises the same contentions she brought before the Bankruptcy Court.

According to Suderov, "although the Davis' [sic] did not receive money in their pocket," they received $49,738.73 in consideration for the transfer. Suderov lists as consideration to the Davises the following: (1) payment by Mrs. Suderov of $11,058.73 to pay-off the FHA mortgage arrears; (2) Mrs. Suderov's taking on the remainder of the FHA mortgage, in the sum of $24,680; (3) Mr. Suderov's satisfaction of the Sterling mortgage in the sum of $14,000. As additional consideration to the Davises, Suderov cites the value of the lease to their daughter Tammy with the option to repurchase. Assuming the appraisal value of the Davis property is between $55,000, the lowest appraisal value, and $75,000, the value of the property stated in the Davises' bankruptcy petition, Suderov contends the Davises received reasonably equivalent value or fair consideration because they received somewhere between 70% to 90% of the value of the property. This Court disagrees.

In order to determine whether reasonably equivalent value was given for the sale of property that is sought to be voided under section 548 of the Bankruptcy Code, the courts employ one of several methods. Although these methods arise in the context of a foreclosure sale, they are equally applicable to the present circumstances.

The first method follows the decision in *Durrett v. Washington Nat. Insur. Co.,* 621 F.2d 201 (5th Cir.1980), and provides that a

non-judicial foreclosure sale which brings a price that is less than 70% of the market value of the property does not constitute reasonably equivalent value. This method is the one employed by Mrs. Suderov in support of her contention that reasonably equivalent value was given to the Davises for their property. The second method follows the decision of the Bankruptcy Appellate Panel for the Ninth Circuit in *Lawyers Title Ins. Co. v. Madrid (In re Madrid)*, 21 B.R. 424 (9th Cir. BAP 1982), *aff'd on other grounds*, 725 F.2d 1197 (9th Cir.), *cert. denied*, 469 U.S. 833, 105 S.Ct. 125, 83 L.Ed.2d 66 (1984), and provides that the consideration received from a non-collusive and regularly conducted foreclosure sale is conclusively presumed to constitute reasonably equivalent value.

These two methods, however, have been rejected by bankruptcy courts in the Eastern and Southern Districts of New York. *See In re Brown*, 104 B.R. 609, 614–16 (Bankr. S.D.N.Y.1989); *In re Pruitt*, 72 B.R. 436, 444–46 (Bankr.E.D.N.Y.1987). The *Durrett* method has been rejected because it is based on a mere percentage test without accounting for the nature of the foreclosure market. *See Pruitt*, 72 B.R. at 445. Moreover, applying the *Durrett* method can result in inequality among creditors, because those unsecured creditors who have foreseen the possibility of foreclosure and a depressed foreclosure market will receive a windfall from the avoidance. *Brown*, 104 B.R. at 615. The *Madrid* method has been rejected because Congress refused to enact an amendment to section 548 of the Bankruptcy Code that would have codified *Madrid's* conclusive or irrebuttable presumption of reasonably equivalent value when the sale is non-collusive and regularly conducted. *See Brown*, 104 B.R. at 616 (citing to legislative history of Bankruptcy Amendments and Federal Judgeship Act of 1984).

■ In determining whether the Suderovs gave reasonably equivalent value to the Davises for the transfer of the property, Judge Goetz employed a third method for ascertaining reasonably equivalent value that is based on a case-by-case analysis. This was the method employed by the court in *Pruitt*, and follows the holding in *Matter of*

*Bundles*, 856 F.2d 815 (7th Cir.1988). According to this method,

"[r]easonable equivalent value must depend on the facts of each case. Relevant considerations include the fair market value of the property at the time of the sale, the nature of the property in question and its relative marketability, and the number of person appearing and bidding on the foreclosure.

Most courts have placed the greatest weight on the disparity between the sale price and the fair market value of the property. Absent unusual circumstances, this will typically be the controlling consideration."

*Pruitt*, 72 B.R. at 445 (quoting *Hoffman v. Heritage Savings & Loan Assn. (In re Garrison)*, 48 B.R. 837 (D.Colo.1985)).

Finally, a fourth method for determining reasonably equivalent value was employed by the court in *Brown, supra*. By this method, the bankruptcy court should inquire whether the sale was properly conducted and non-collusive, and examine the totality of circumstances to determine whether commercial reasonable steps were taken to achieve the best sale price at the foreclosure. If the court finds that commercially reasonable steps were not taken, or that the sale was not conducted properly, the court may then inquire into the adequacy of the sale price. *Brown*, 104 B.R. at 614, 616 (following *Lindsay v. Beneficial Reinsurance Co.*, 98 B.R. 983 (Bankr.S.D.Cal.1989)).

Although the Second Circuit has yet to rule on the issue of how reasonably equivalent value is to be determined for the purposes of voiding a transfer under section 548, this Court holds that the method employed in *Pruitt* and used by Judge Goetz is the proper method. In so holding, the Court notes that the method used by the Court in *Brown* would be appropriate in certain circumstances, but is less suitable in the instant case then the method used by the *Pruitt* court.

Accordingly, Suderov's contentions that the Davises received reasonably equivalent value or fair consideration because they received somewhere between 70% to 90% of

the value of the property from Suderov are unpersuasive. The Court declines to follow any method for calculating reasonably equivalent value that is based on a fixed percentage of the marketable value of a property without taking into account other relevant factors.

■ Examining the totality of facts of this case, this Court first notes that there are questionable circumstances surrounding this transaction, and that the sale to Phyllis Suderov and leaseback to Tammy Davis was highly irregular. Further, the Court finds a wide disparity between what was paid for the property by Suderov and the value of the property.

To begin with, the Court does not accept the contention that all of the items listed by Suderov represent "consideration". The $14,000 to satisfy the Sterling mortgage cannot be consideration, because the mortgage was forged, and therefore invalid. Moreover, assuming without deciding that Mrs. Suderov's payment of the FHA mortgage arrears and her assumption of the balance of $24,680 on the FHA mortgage can be deemed consideration, the Court agrees with Judge Goetz that these payments were of no benefit to the Davises, because they simultaneously lost the title to their home. Despite the Davises' being relieved of the mortgage arrears debt, the ultimate beneficiary of removing these encumbrances on the property was Suderov as the subsequent property owner, and not the Davises as the mortgagors.

The Court also agrees with Judge Goetz that payments made by Phyllis Suderov to her husband and to the attorneys and brokers were of no benefit to the Davises. In this Court's view, the statement of closing expenses and costs prepared by Naeder is an accounting exercise that is devoid of reality, fraudulent in nature, and aimed at suiting the needs of Suderov by showing that more was paid for the property than what was actually paid. The Court need only point to the $5,000 expense for installation of cabinets never installed and the $1,000 "real estate commission" to Wiener as evidence of the statement's questionable character.

When stripped to its fundamentals, this transaction entailed Suderov paying $11,058 to the FHA for the mortgage arrears, and receiving $4,000 in cash from the Davises, plus title to a home and land worth somewhere between $55,000 and $85,000 that was subject to a $24,000 mortgage. In addition, Suderov obtained a tenant who obligated herself not only to pay $1106 a month in rent, but also $12,719 upon default plus the termination of the leasehold. Thus, for expending the sum of $7,058, Suderov not only bought out the Davises, but caused them to become indebted to her for rent payments she knew they could not meet given their limited income. In return, the Davises paid Suderov $4,000 to be relieved of their $11,058 debt on the mortgage arrears, lost the title and equity in their home—computed to be somewhere between $19,000 and $49,000—, and incurred an obligation to guarantee $1,106 in monthly rent payments. According to this Court's mathematical calculations, Suderov made a substantial gain from the sale, while the Davises not only did not receive reasonably equivalent value, but they actually lost money from the transaction since their equity was more than the FHA mortgage arrears obligation that was extinguished. In the Court's view the transaction was not only unfair to the Davises, but was a total sham.

When viewing all of the facts of this case, it is evident that the Davises received neither a reasonably equivalent value for the transfer of their home to Phyllis Suderov, nor fair consideration, as a matter of law. To the extent the Bankruptcy Court's determinations that the transfer was of no benefit to the Davises and was not for reasonably equivalent value are findings of fact, the Court finds that these determinations are not clearly erroneous.

(ii) *The Davises Were Rendered Insolvent.*

Judge Goetz also determined that the Davises were left insolvent as a result of the transfer of their property to Suderov. According to Judge Goetz, before the June 16th closing the Davises were not insolvent because the equity in their home exceeded their liabilities. However, after the closing the Davises were left insolvent because they had lost their one significant asset, the equity in their home, while retaining the remainder of

their pre-existing debts—approximately $1,284 in doctor's bills and the $12,500 owed on the cadillac—plus incurring the contingent liability of $12,719 for a year's rent.

Mrs. Suderov disputes that the Davises were left insolvent as a result of the transfer. She first contends that the Davises were insolvent prior to the closing, because their liabilities exceeded the $55,000 value of their property. According to Suderov, the Davises owed (i) $11,058.73 in FHA arrears, (ii) $24,680 on the balance of the FHA mortgage, (iii) $14,000 on the Sterling mortgage, and (iv) unsecured debt of $9,342.20, as of June 16, 1992. Suderov contends these debts totaled approximately $59,000, or $4,000 more than the value of the house.

Alternatively, Suderov contends that even if the value of the Davis property is estimated at $75,000, the Davises were not left insolvent as a result of incurring the contingent liability for the full amount of one year's rent under the lease. Suderov claims that this liability should not be included among the Davises' post-closing liabilities, and takes issue with the Bankruptcy Court's determination that the Davises were almost "certain" to be called upon to make good on their guarantee of the one year's rent under the lease agreement. According to the Suderovs, the Davises were only responsible for each monthly payment and not the full amount of the lease.

The Court finds these arguments unpersuasive, and indicative of the appellant's complete misreading of the applicable statute. Moreover, the Court finds the latter contention patently erroneous, as it is belied by the fact that within two weeks of missing the first rent payment, Suderov obtained a judgment against the Davises for the entire year's rent.

In addition, the Court finds Suderov's figure for the amount of the Davises' unsecured debt to be misleading. Contrary to Suderov's contention, her $9,342 figure is not the amount of pre-closing unsecured debt held by the Davises. The $9,342 figure is listed by the Davises on Schedule F of their bankruptcy petition as the amount of debt held against the estate by unsecured creditors at the time of their bankruptcy petition. In-

cluded within this sum is a debt to Phyllis Suderov for $8,058, incurred by the Davises as a result of the closing. The $8,058 sum reflects the payment by Suderov for the FHA mortgage arrears plus other closing costs, less a credit for payments made to Suderov by the Davises. By adding the $9,342 to the Davises debt, Suderov is double-counting the mortgage arrears debt. According to this Court's calculations, the amount of the Davises' pre-closing debt was the sum of $13,784, consisting of (1) $1,284 in doctor's bills which are listed by the Davises as unsecured claims, and (2) $12,500 owed on the cadillac, which is listed by the Davises as a secured claim.

This Court agrees with the determination of the Bankruptcy Court that the Davises were insolvent as a result of the transfer.

Section 548(a)(2)(B)(i) of the Bankruptcy Code provides that a transfer of property the debtor has an interest in may be avoided, if the debtor "was insolvent on the date that such a transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation." According to the legislative history, "[t]ransfers made for less than reasonably equivalent consideration are also vulnerable if the debtor was or thereby became insolvent, . . . or intended to incur debts that would be beyond his ability to repay." *See* House Report No. 595, 95th Cong., 1st Sess. 375 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6331. The section is a codification of case law decided under section 67 of the Bankruptcy Act, holding that transfers made during insolvency or which resulted in insolvency were voidable. *See 4 Collier on Bankruptcy,* ¶ 548.03 at 548–50 to 53 (15th Ed.1994) (citing cases).

Accordingly, if the Davises were either insolvent at the time of the closing, or were rendered insolvent as a result of the transfer, then the transfer may be voided. Thus, even if Mrs. Suderov's contention that the Davises were insolvent at the time of the closing is true, the contention undermines her own argument and supports voiding the transfer as a fraudulent conveyance.

Section 101(32)(A)(ii) of the Bankruptcy Code defines "insolvent" in relevant part to mean:

[a] financial condition such that the sum of [the debtor's] debts is greater than all of such [debtor's] property, at a fair market valuation, exclusive of ... property that may be exempted from property of the estate under section 522 of this title.

This definition is applicable to determining insolvency for the purposes of avoiding a transaction under section 548 of the Bankruptcy Code. *In re Sims,* 112 B.R. 259, 262 (Bankr.N.D.Ill.1990).

■ In order to determine whether the Davises were insolvent, their debts must be compared to the fair market value of their non-exempt property. As of June 16, 1992, prior to the closing, the Davises had approximately $49,522 in debt. This figure is calculated by adding the $11,058.73 in FHA arrears, the $24,680 balance on the FHA mortgage, and their debt on the cadillac and doctors' bills of $13,784. The Court does not recognize as a debt the $14,000 on the Sterling mortgage, as that mortgage was forged and invalid. The value of the Davises' non-exempt property is conservatively estimated by this Court at $46,100, and is calculated as follows: assuming the value of the home was $55,000, the non-exempt value of the property was $35,000 ($55,000 less the $20,000 homestead exemption under New York State law); the non-exempt value of their cadillac was $9,600 ($12,000 less a $2,400 exemption available under New York State law); and their pick up truck was valued at $500. Thus, assuming the value of their home is estimated at the lowest appraisal value of $55,000, the Davises were insolvent at the time of the closing.

After the closing, the Davises remained responsible for the following liabilities: the $13,784 debt on the cadillac and doctors' bills, and the $12,719 contingent liability for the years rent under the Lease, totalling $26,503. The value of their non-exempt assets had decreased to $10,100, the value of the cadillac and pick-up truck. Clearly, the sale/lease-back of their home to Phyllis Suderov left the Davises insolvent. Thus, no matter how the Davises situation is viewed, Judge Goetz was correct to. void the transfer of the property to Phyllis Suderov as a fraudulent conveyance because the Davises were either insolvent at the time of the closing, or if not, they clearly became insolvent after the closing.

There is no merit in Suderov's contention that the Davises' liability for the year's rent should be excluded from their post-closing debts. As Judge Goetz correctly determined, a "debt" is defined under the Bankruptcy Code as a liability on a claim. 11 U.S.C. § 101(12). A "claim" in turn, is defined as a right to payment, and includes a contingent liability or an unmatured debt. 11 U.S.C. § 101(5). The definition of a "claim" is given the broadest possible meaning under the Bankruptcy Code. *See e.g., Pennsylvania Dep't of Public Welfare v. Davenport,* 495 U.S. 552, 557–58, 110 S.Ct. 2126, 2130, 109 L.Ed.2d 588 (1990); *In re Chateaugay Corp.,* 944 F.2d 997, 1003 (2d Cir.1991); *In re UNR Industries, Inc.,* 20 F.3d 766 (7th Cir.1994) (the definition of a claim is "capacious"). Indeed, including the contingent liability for the year's rent among the Davises post-closing debts is consistent with the language of section 548(a), which allows a transfer of an interest of the debtor in property *or any obligation incurred by the debtor* to be voided as a fraudulent conveyance. The official comment to the statute makes clear that any debts incurred that are beyond the ability of the debtor to repay are encompassed within the statute. The Davises' contingent liability for the amount of the year's rent was, therefore, properly deemed by the Bankruptcy Court as a debt the Davises were responsible for after the closing.

■ In order to value a contingent liability, a bankruptcy court must determine the likelihood that the contingency will occur, and multiply the total debt guaranteed by that probability. *Covey v. Commercial Nat'l Bank of Peoria,* 960 F.2d 657, 659–60 (7th Cir.1992). In this case, Judge Goetz determined that the Davises "were almost certain to be called upon to make good on their guarantee," so that the entire amount of the year's rent was the value of the debt. This Court agrees with Judge Goetz's valuation of this liability.

■ Under the facts of this case, the gross income levels of Tammy Davis and Mr. and Mrs. Davis, together with their other debt obligations, made it a virtual certainty that none of these persons could ever meet the $1,106 per month rent payment, let alone the entire $12,719 upon default. Accordingly, this Court finds no error in the Bankruptcy Court conclusion, as a matter of law and fact, that the Davises were almost certain to be called upon to make good on their guarantee, and that the entire amount of the contingent liability was the value of the debt.

### C. The Bankruptcy Court Properly Voided the Lease Agreement.

Suderov also contends that the Bankruptcy Court did not have the authority to void the Lease agreement between Phyllis Suderov and Tammy Davis. According to Suderov, Judge Goetz voided the Lease because she found it to be unconscionable under New York law. However, since the Lease agreement was between Phyllis Suderov and Tammy Davis, who is not a debtor, Suderov contends that the Bankruptcy Court had no authority to declare the Lease unconscionable and void it.

The appellant misunderstands the Bankruptcy Court's basis for voiding the Lease agreement. The Bankruptcy Court voided the Lease in the context of disallowing the Suderovs' claim against the debtors' estate for $15,600, of which $14,779 was for the year's rent under the Lease, plus costs. The Bankruptcy Court has core jurisdiction under 28 U.S.C. § 157(b)(2)(B) to consider objections to claims and the disallowance of claims against the debtors' estate. Contrary to Suderov's contention, the Bankruptcy Court had the authority to determine whether the Lease was unconscionable within the context of reviewing the Suderovs' claim.

In order to consider whether the Suderovs had a valid claim for the Lease rent, the Bankruptcy Court had to determine whether the Lease itself was valid. The Bankruptcy Court determined that the Lease was not valid, and as a result reduced the Suderovs' claim, on two grounds.

The first ground on which the Bankruptcy Court based its determination was that the Lease could not survive the voiding of the transfer of the property. The transaction in this case was a sale/leaseback; that is, a sale of the property to Suderov, followed by a leasing back of the property to Tammy Davis, with the Davises as guarantors of the rent. Mrs. Suderov attempts to split the transaction by arguing that the while the Bankruptcy Court could void the sale portion, it could not void the resulting leaseback. Her argument, however, puts form before substance and is unpersuasive.

■ Although bona fide sale/leaseback agreements under state law are recognized as valid under the Bankruptcy Code, *see e.g.*, *In re Continental Airlines, Inc.*, 932 F.2d 282, 287 (3d Cir.1991), *Steele v. Gebetsberger (In re Fashion Optical, Ltd.)*, 653 F.2d 1385 (10th Cir.1981), whether a sale/leaseback is bona fide depends on the circumstances of each case, particularly the economic · substance of the transaction. *See In re Chateaugay Corp.*, 102 B.R. 335, 343 (S.D.N.Y. 1989). In determining the economic substance of the transaction, the court looks to whether the leaseback actually transfers the normal risks and responsibilities attendant to a lease. *Id.*

Under the circumstances of this case, the economic substance of the transaction at issue transferred more than the normal risks and responsibilities to the tenant and guarantors of the lease. Aside from the questionable character of this transaction, Mrs. Suderov knew the Lease was certain to fail, thereby giving her a windfall of one year's rent in addition to a property worth at least $55,000 for which she effectively paid $7,058. The sale/leaseback was hardly bona fide, and in this Court's view cannot be separated into two distinct transactions. The latter falls with the former as a matter of law. Moreover, if the transfer in fee simple to Suderov is voided and she must transfer title back to the Davises, Suderov's possessory interest in the property is extinguished and she cannot lease it to the Davises in any event.

The second basis for finding the Lease invalid is that the Bankruptcy Court determined that the entire sale/leaseback transaction was unconscionable under New York

law. Mrs. Suderov maintains that neither the Lease nor the entire transaction is unconscionable.

Under New York law, to be found unconscionable a contract must be so grossly unreasonable in light of the mores and business practices of the time and place as to be unenforceable. *Sablosky v. Gordon Co.*, 73 N.Y.2d 133, 138, 538 N.Y.S.2d 513, 535 N.E.2d 643 (1989). A determination of unconscionability is generally based upon two aspects: procedural, namely the absence of meaningful choice, and substantive, namely, contract terms unreasonably favorable to the other party. *Gillman v. Chase Manhattan Bank*, 73 N.Y.2d 1, 10, 537 N.Y.S.2d 787, 791, 534 N.E.2d 824 (1989); *Williams v. Walker–Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C.Cir.1965). The concept of unconscionability is "sensitive to the realities and nuances of the bargaining process." *Gillman*, 537 N.Y.S.2d at 791, 534 N.E.2d at 828.

Judge Goetz found that all of the elements of an unconscionable lease are present, "including gross imbalance in bargaining power and sophistication and a result which must shock any disinterested observer." *Davis*, 148 B.R. at 177. This Court agrees.

The Davises were people of little means who lacked any real estate experience. The Suderovs were sophisticated and experienced in real estate transactions, having entered into eight similar sale/leaseback transactions. Procedurally, the Davises did not comprehend the transaction and closing documents, were the victims of misrepresentations by Mr. Suderov, and were under considerable pressure to sign the closing documents under the impression that they would be getting their house back. There was no "meaningful choice" for them in this transaction, particularly since they had already expended $4,000 in cash in order to consummate the closing. Simply put, choice and a balance of bargaining power were lacking.

Substantively, the terms of the transaction documents, particularly the Lease, were favorable to the Suderovs. This is reflected in the overall transaction, where Suderov effectively bought-out the Davises for $7,058 and made them indebted to her for rent payments she knew they could not meet, while the Davises paid Suderov $4,000 to be relieved of their $11,058 debt on the mortgage arrears, but lost title and the entire equity in their home in addition to incurring an obligation to guarantee $1,106 in monthly rent payments.

The unfavorable terms of this transaction are also reflected in the Lease agreement. Under the Lease, Tammy Davis is obligated to pay, and the Davises guarantee, $1,106 a month and the entire year's rent upon default. As stated above, it is clear from the record that neither Tammy Davis nor her parents could meet this obligation. Moreover, the Lease is for a one year term renewable annually five times, and terminates on the fifth year unless the Davises exercise the option to purchase the property. According to paragraph 31 of the Lease agreement, it would cost $56,500 to purchase the property in the first year. The Bankruptcy Court determined that the cost to purchase the property would be $109,000 by the fifth year. If the Davises decided not to purchase the property but to remain tenants after the fifth year, their rent would increase according to paragraph 37 by "33 and ⅓ percent over the gross payment at the end of the term." The Bankruptcy Court found that by the fifth year, the rent would be just under $1800 per month. A 33 and ⅓ percent increase would raise the rent to approximately $2,400 a month. In effect, the Lease terms ensure that the Davises will loose the leasehold after five years because they would never be able to afford to purchase the property, or to pay the monthly rent at the end of the term of the Lease.

The Bankruptcy Court had the authority and correctly determined that the entire sale/leaseback transaction, including the Lease agreement, was unconscionable as a matter of New York law. Moreover, it correctly determined that the Lease agreement was void and did not survive the voiding of the transfer of the property to Phyllis Suderov.

### D. *The Suderovs' Claim Was Properly Reduced.*

Having found the Lease invalid, the Bankruptcy Court reduced the amount of the Su-

derovs' claim. The Bankruptcy Court determined that under the circumstances, Phyllis Suderov was entitled to no more than the return of her out-of-pocket expenses protected by a lien on the property returned to the Davises. The Court calculated these expenses at $12,238.23, less the $4,000 payment to Suderov, for a total of $8,238.23. In order to give effect to the Davises' fresh start under the Bankruptcy Code, Judge Goetz approved repayment of these expenses to Suderov over a five year period, as set forth in the Davises' Chapter 13 plan of reorganization.

In arriving at its figure for the Suderovs' out-of-pocket expenses, the Bankruptcy Court disregarded the money the Suderovs put in their own pockets, *i.e.*, the payments to Mr. Suderov for services rendered, and the money paid for broker and attorney's fees. Suderov contends that the proper amount of her out-of-pocket expenses should include these closing costs as well as certain other post-closing tax and mortgage payments, all amounting to $12,994.23. Moreover, she contends that $3,500 and not $4,000 should be set-off against this amount, because $500 of the $4,000 payment by the Davises went to Golub as a broker's fee. According to Suderov, the proper amount of her claim is $9,494.23.

The Bankruptcy Court properly excluded from the Suderovs' claim the closing costs, the various attorney's and broker's fees, and the post-closing tax and mortgage payments, as these payments were of no benefit to the Davises. Suderov has no right to payment for these expenses from the Davises. Accordingly, the Bankruptcy Court correctly determined the amount of the Suderovs' claim against the estate.

## CONCLUSION

In this Court's view, this case unfortunately reveals a picture of greed and unconscionable conduct. A family of eight people living on limited income was exploited by a group of real estate sophisticates with the aim of taking away from them their only real asset, the family home. But for the protection of the Bankruptcy Court, the family would have probably been evicted and would face a bleak residential future. The Court

agrees with Judge Goetz's assessment, that "[t]he deal into which the Davises were tricked into entering was worse than usurious. All those who participated deserve to be condemned." *Davis*, 148 B.R. at 177.

The Opinion and Order of the Bankruptcy Court respectively dated November 18, 1992 and December 23, 1992 are affirmed in all respects. Pursuant to Fed.R.Bankr.P. 8014, costs are imposed against the appellant.

The Clerk of the Court is advised that this action closes the case.

**SO ORDERED.**